80 N.J. Super. 68 (1963)
192 A.2d 860
LEOLA BOOKER, PETITIONER-RESPONDENT,
v.
JAMES SPENCE IRON FOUNDRY, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1963.
Decided July 3, 1963.
*71 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Isidor Kalisch argued the cause for appellant.
Mr. Mortimer Wald argued the cause for respondent (Messrs. Wald, Soperstein & Franz, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
In this workmen's compensation case respondent disputes determinations by the Hudson County Court in favor of petitioner, both in respect of the causal connection between the workman's death and his employment and as to petitioner's status as the dependent widow of the decedent. The Division of Compensation held adversely to petitioner on both issues, but Judge Duffy reversed and directed the entry of an award. We have concluded he was right.

I.
[The court decided that there was causal relationship between the decedent's work and working conditions and his fatal heart attack.]

II.
Petitioner, Leola Booker, entered into a ceremonial marriage with the deceased workman, Coleman Booker, on January 18, 1958 in Jersey City, and they lived together in that city until his death on August 28, 1959. No children were born of the marriage. Respondent impugns Leola's status as statutory dependent wife of the decedent. It does so by contending that both Leola and decedent were legally married to other persons at the time they entered into the 1958 marriage to each other. We consider first the case as to Leola's prior marital involvement.

A.
Leola was married in Georgia to one Sandy Bulger (or Bolger) in March 1939 and lived with him until 1941, when *72 they separated. To a question on cross-examination, "You have never been divorced to your knowledge? He has never divorced you and you have never divorced him; is that correct?" she responded, "That is right."
At the time of separation Leola and Bulger were living in Jersey City. He was then employed by the New Jersey Central Railroad. Leola never saw him after 1942 and did not know whether he was alive or dead as of her own knowledge. She testified, however, over objection, that Bulger's father, who then resided in Newark, told her in 1954 or 1955 that Bulger had died and been buried in Virginia. Petitioner had been told that Bulger's father died two years before the hearing. Bulger had no other living relatives.
Respondent sought to establish that Bulger was alive in 1958 through the testimony of one Catherine Johnson. She appeared as a witness February 17, 1961 (hearings in the case began July 15, 1960). She said she was first approached about this case by Maynard Booker, a brother of the decedent, in October 1956, a time she identified as being when she first moved to Jersey City. Maynard asked her if she knew Bulger. She was approached by an investigator for the respondent on February 8, 1961. She testified she had known Bulger for several months in 1947, but did not see him thereafter until the spring of 1958 when she was getting off a bus in Newark, encountered him on the street, and spoke with him briefly. She next saw Bulger, she stated, on February 7, 1961 (the day before she spoke with respondent's investigator), when he was boarding and she leaving the same bus in Jersey City. They exchanged brief greetings. For some unexplained reason, she was asked by the Jersey City Police Department the day before her testimony to identify a snapshot of a person described to her by the police as Bulger, but she could not do so.
Mrs. Johnson testified that the Friday evening before the hearing (which would be February 10, 1961) she went to Newark directly after finishing work in Jersey City and visited three bars where she inquired about Bulger. In one *73 place, the bartender said he had just left there an hour before; in another the bartender said that he frequented the place. At the third place a girl friend told her she had seen Bulger recently. She asked the bartenders if they knew where Bulger lived or worked, but they could not say. None of these bartenders or the girl friend were produced as witnesses by respondent. Respondent's investigator had discussed the quest for Bulger with Mrs. Johnson and suggested she notify him if she "noticed" him. He also told her Bulger's "name" was Elijah, by which name one of the bartenders had identified Bulger to her as the man lately in his bar.
It is well settled that there is a strong presumption that the latest of two or more marriages involving a common participant is presumed valid when the validity of that marriage is in issue in a legal proceeding and that the presumption is that the prior marriage has been terminated by death or divorce before the contracting of the marriage in issue. Evidence variously described as "clear and conclusive," Schuler v. Schuler, 114 N.J. Eq. 220, 226 (E. & A. 1933); Minter v. Bendix Aviation Corp., 26 N.J. Super. 268, 273 (App. Div. 1953), modified on other grounds 24 N.J. 128 (1957), and, more recently, as "clear and convincing," is required to overcome these presumptions as to the termination of the prior marriage. Simmons v. Simmons, 35 N.J. Super. 575, 581 (App. Div. 1955); Winn v. Wiggins, 47 N.J. Super. 215, 220 (App. Div. 1957); Balazinski v. Lebid, 65 N.J. Super. 483, 492 (App. Div. 1961). The presumption in favor of the validity of the last marriage is so strong, moreover, that when the opponent thereof submits a prior marriage of one of the parties it is his affirmative obligation to show that the parties to the prior marriage were at that time free from disabilities against a lawful marriage. See Sparks v. Ross, 72 N.J. Eq. 762, 766 (Ch. 1907), affirmed 75 N.J. Eq. 550 (E. & A. 1909); Schaffer v. Schaffer, 88 N.J. Eq. 192, 194 (Ch. 1917), affirmed sub nom. Schaffer v. Krestovnikow, 89 N.J. Eq. 549 (E. & A. 1918); Keller v. Linsenmyer, 101 N.J. Eq. 664, 678 (Ch. 1927). These presumptions in *74 favor of the latest marriage are entertained in almost all jurisdictions. Annotation, 14 A.L.R.2d 7 et seq. (1950).
Applying these rules to the facts before us, it should first be observed that, although petitioner's brief concedes that she and Bulger were never divorced, she appears to have conceded more than she was required to do as against the presumption that she and Bulger were divorced before she married decedent. True, she testified she never divorced Bulger and had no knowledge of any divorce obtained by him against her. However, for aught that appears, he might have secured a divorce from her which never came to her attention. Under the predominant viewpoint, the presumption of divorce terminating the prior marriage is not dissipated by the negative testimony of only one party to that marriage, unless there is also evidence that a search of the records of those jurisdictions where either of the parties may reasonably be deemed to have resided affirmatively shows no such divorce. See the line of cases cited in Annotation, 14 A.L.R.2d, supra, at pp. 50, 51. There is some support for that view in our own cases. See Sparks v. Ross, supra (75 N.J. Eq., at p. 553); Keller v. Linsenmyer, supra, 101 N.J. Eq., at p. 677; cf. Sparks v. Ross, 79 N.J. Eq. 99, 102 (Ch. 1911), affirmed 79 N.J. Eq. 649 (E. & A. 1912). See also Rudyk v. Rudyk, 278 App. Div. 837, 104 N.Y.S.2d 491 (App. Div. 1951); Rutledge v. Rutledge, 41 Tenn. App. 158, 293 S.W.2d 21 (Tenn. Ct. App. 1953).
In any event, we are satisfied that respondent has not satisfactorily refuted the presumption that Bulger died before Leola's marriage with the decedent, and this is dispositive of Leola's qualification to marry decedent without regard to what one might conclude as to the presumption of divorce. While we are required to, and normally would accord respectful consideration to a finding of fact by the judge of compensation where questions of credibility are concerned, we cannot do so in this case because the judge's finding that Bulger was alive proceeded from a mistaken assumption, as stated in his conclusions, that it was petitioner's burden to *75 establish the validity of her marriage to decedent and "to establish an inference" that her first husband was deceased when she married Booker. True, as petitioner, Leola had the initial burden of establishing every prerequisite of her right to recover. But she did show a prima facie marriage to decedent. When the fact of a prior marriage was educed, the burden of establishing its validity and subsistence as against the later marriage was that of the respondent.
Our own independent appraisal of the proofs satisfies us that respondent did not carry its heavy burden to refute the presumption that Bulger died before Leola's marriage to Booker. The sole reliance is upon the Johnson testimony. We find it not worthy of credence, as against a presumption as weighty as that here involved. Mrs. Johnson's bias in favor of respondent is manifest. She was apparently an active ally of its investigator in the search for Bulger. Respondent's failure to produce the Newark people who supposedly told Mrs. Johnson that they had recently seen Bulger, or to explain their nonproduction, comes close to demolishing her credibility. On the other hand, if her testimony as to what she was told by these people is deemed credible, the respondent's burden of proof by "clear and convincing testimony" called upon it to produce such persons in court to supply their first-hand knowledge of Bulger's survival or to explain its failure to do so. Equally destructive of Mrs. Johnson's credibility is her story that decedent's brother approached her about the case in 1956, a time when there was no case, or even any marriage between Leola and decedent. We conclude the testimony she gave of having seen Bulger in 1958 and 1961 was probably a fabrication. At the least, no clear and convincing testimony has been adduced to refute the presumption that Bulger was dead when Leola married the decedent.

B.
We pass to assessment of respondent's position in respect of the asserted disqualification of Booker to marry petitioner. *76 This was rested by respondent on the testimony of one Lizzie Lee who said she married Booker in Georgia in 1938. A marriage certificate so indicating was admitted in evidence. They lived in Virginia and came to Jersey City in 1940. She separated from Booker in 1944. She said no divorce proceedings were ever instituted between them at any time. Lizzie makes no claim to compensation for Booker's death.
Lizzie admitted that she had married one Maris Gibson in Georgia when she was 15 years of age, which would have been about 1926, according to her testimony. Although there was no marriage certificate, the marriage was performed by a preacher in the bride's father's home in the presence of her relatives, after which there were festivities of celebration of the nuptials. She lived with Gibson a year or two as husband and wife, and she considered herself his wife at that time. She last saw Gibson in 1930 at which time he had remarried. They were never divorced.
One Robert Brooks, a nephew of Lizzie, testified he was present at the marriage of Lizzie to Gibson; that he frequently saw Gibson on trips to Georgia to visit his mother, most recently in 1954 and 1955.
On these proofs, there are two substantial bases upon which to find that the presumption of the validity of the Leola-Coleman Booker marriage has not been adequately rebutted by proof of Booker's 1938 marriage to Lizzie. The first of these is the insufficiency of the evidence to refute the auxiliary presumption that Lizzie's marriage to Booker was terminated by divorce prior to the latter's marriage to Leola. The second is that respondent has not established Lizzie's legal eligibility to marry Booker in view of her previous marriage to Gibson.
As to the first matter, we have already seen, in II A of this opinion, that the mere testimony of only one of the parties to a prior marriage that there was no divorce, will not refute the presumption that there was, which the law sets up to aid the hypothesis of the validity of the later marriage which is in issue in the action. As indicated, it was incumbent upon *77 respondent to offer a search of the records of the jurisdictions where Booker resided after he separated from Lizzie negating his obtaining a divorce. Since New Jersey was the only such jurisdiction, the making of such a search would have been a simple matter. If the whole case depended upon such a showing, we might have been disposed to give respondent an opportunity to make and prove the results of such a search. However, respondent has not hurdled the more formidable barrier of Lizzie's marriage to Gibson as disqualifying her for a legal marriage to Booker.
As we also demonstrated in II A of this opinion, the strength of the presumption of the validity of decedent's last marriage puts the onus on respondent to show, insofar as it was relying on his marriage to Lizzie to invalidate his last marriage, that with Leola, that Lizzie was free from any disability to marry Booker in 1938. It appearing that Lizzie had married Gibson in or about 1926, it was respondent's burden, accordingly, to show that the latter marriage was not valid when entered into or legally subsisting in 1938. In other words, in the context of the tangled marital skein here shown and the specific legal issue here involved, there was no presumption of the validity of the Lizzie-Booker marriage as against the Lizzie-Gibson marriage merely because it was later, but rather vice versa. This is because the marriage now in issue as to validity is the Leola-Booker marriage, and the strong presumption of its validity calls to its aid an auxiliary presumption of the validity and subsistence in 1938 of the Lizzie-Gibson marriage in order to cancel the asserted effect of the Lizzie-Booker marriage to deprive Leola of dependent marital status in the current proceedings.
Respondent has not convincingly met the burden stated. No proof has been offered to show that Lizzie's marriage to Gibson was not valid under the laws of Georgia when entered into and thereafter. Indeed, the Georgia authorities appear to indicate it was valid, even if only as a common-law marriage. See Allen v. State, 60 Ga. App. 248, 3 S.E.2d *78 780 (Ct. App. 1939); Steed v. State, 80 Ga. App. 360, 56 S.E.2d 171 (Ct. App. 1949); Peacock v. Peacock, 196 Ga. 441, 26 S.E.2d 608 (Sup. Ct. 1943); Gay v. Pantell, 164 Ga. 738, 139 S.E. 543 (Sup. Ct. 1927). In Miller v. Grice, 165 Ga. 191, 140 S.E. 350 (Sup. Ct. 1927), it was held that where no other marriage is proved the law will presume marriage from cohabitation and repute. If valid in Georgia where entered into, the marriage is of course also valid here.
The evidence was ample that Gibson was alive in 1938 and thereafter. Although Gibson was shown to have remarried by 1930, respondent has not proven a divorce between Gibson and Lizzie, and she testified there was none. Under the proofs and applicable presumptions, Lizzie was married to Gibson and not free to marry Booker in 1938.
It results that respondent has failed to produce clear and convincing evidence that Lizzie was free from legal disability to marry Booker in 1938, and accordingly it must be our ruling that that marriage did not disqualify Booker from marrying petitioner in 1958.
The presumption of the validity and subsistence of petitioner's marriage to the decedent withstands respondent's attempt to overcome it.
Judgment affirmed.