Isabel R. McMORROW a/k/a Rita McMorrow, Plaintiff,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendants.

Civ. No. 80–145.

United States District Court, D. New Jersey.

April 21, 1982.

Carluccio & Carluccio by Robert J. Carluccio, Hoboken, N.J., for plaintiff.

W. Hunt Dumont, U.S. Atty., by Judy Sello, Asst. U.S. Atty., Newark, N.J., for defendants.

OPINION

BIUNNO, Senior District Judge.

This is a suit to review a final decision of the Secretary denying plaintiff's claim for widow's insurance benefits under Title II of the Social Security Act, as amended.

It comes before the court on defendant's motion for summary judgment, an inartistic but convenient procedural device to calendar the case for hearing without encumbering it with the inapplicable steps of discovery and pretrial conference used for the regular trial list. Under the statute providing for judicial review, 42 U.S.C. § 405(g), the record of the proceedings before the agency is to be filed with the answer, see *Villines v. Harris,* 487 F.Supp. 1278 (D.N.J. 1980).

When the answer and record are filed, the practice in this District is for the agency to bring on a motion for summary judgment, nominally under F.R.Civ.P. 56, with a brief. The plaintiff then submits an answering brief and the matter is heard on the date noticed.

The review here is in the nature of a review on a common law writ of certiorari, and is analogous to an action for prerogative writ in the Superior Court of New Jersey to review a decision of a State administrative agency, under *N.J. Const. 1947,* Art. 6, sec. 5, par. 4, and N.J. Court Rule R. 2:2–3(a), which employs the machinery of an "appeal" although the proceeding is actually an invocation of the original jurisdiction of the Superior Court. See *N.J. Const. 1947,* Art. 6, sec. 5, par. 3.

There are differences. On a review under § 405(g), no additional evidence may be adduced here to supplement the record, unlike the N.J. prerogative writ review. Cf. *So. Burl. City v. Tp of Mt. Laurel,* 67 N.J. 151, 336 A.2d 713 (1975); *Allendale v. Mahwah,* 177 N.J.Super. 230, 426 A.2d 73 (App. 1981); *Ring v. Rutherford,* 110 N.J.Super. 441, 266 A.2d 129 (App.1970). Nor may it make independent findings. Cf. *Close v. Kordulak,* 44 N.J. 589, 210 A.2d 753 (1965).

Another difference is that the prerogative writ power of the N.J. Superior Court derives from the state's constitution and may not be regulated by legislation, see *Fischer v. Tp. of Bedminster,* 5 N.J. 534, 76 A.2d 673 (1950); *State v. Rivers,* 16 N.J.Super. 159, 84 A.2d 16 (App.1951), while the authority of this court is entirely statutory.

The third difference is that on a review here under § 405(g), the test is whether the challenged findings of fact are supported by "substantial evidence" in the record. If they are, the statute directs that the findings be "conclusive" here. *Dobrowolsky v. Califano,* 606 F.2d 403, at 406 (CA 3, 1979). See, also, *Morsemere S & L Assn. v. Marston,* 500 F.Supp. 1253 (D.N.J.1980) for a discussion of various modes and kinds of judicial review.

The Supreme Court has defined "substantial evidence" as being "relevant evidence which a reasonable mind might accept as sufficient to support the conclusions", *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

■ It is also to be kept in mind that proceedings before administrative agencies are not governed by the Federal Evidence Rules, see Fed.Ev. Rule 1101, the main difference being that ordinarily hearsay evidence is routinely received, although the ancient and widely recognized rules of privilege probably apply, see *Wearly v. FTC,* 462 F.Supp. 589 (D.N.J.1978), vacated as not ripe, 616 F.2d 662 (CA 3, 1980), cert. den. 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 25, after remand, 503 F.Supp. 174 (D.N.J.1980). Compare N.J.Ev.Rule 2(1), N.J.S. 2A:84A–16, making privilege rules applicable "in all cases and to all proceedings, places and inquiries, whether formal, informal, public or private, as well as to all branches of government and by whomsoever the same may be conducted, and none of said provisions shall be subject to being relaxed."

For the differences between judicial review by courts that may exercise original jurisdiction and those that may not, see the discussion in *McNeil v. McDonough,* 515 F.Supp. 113, at 127–129 (D.N.J.1980), *affd.* 648 F.2d 178 (CA 3, 1981).

■ The concept of "substantial evidence" as a test on review also subsumes the applicable law governing the burden of persuasion in the agency proceeding. Thus, if the party challenging the action below had the burden of persuasion, as by a preponderance, and the evidence is conflicting such that the finder of fact might reasonably consider it to be insufficient to carry the burden, then the finding is regarded as "supported by substantial evidence" even though the opposing testimony, taken by itself, might not reach the level specified. This pattern appears most often in cases where the evidence offered in support of the burden is open to questions of credibility, ambiguity or equivocal meaning, or other matters going to the weight of the evidence. Evidence lawfully received need not be accepted as true merely because it is admissible.

*Issues.*

The decision of the Appeals Council, which became the final decision of the Secretary, was that plaintiff was not the widow of the deceased wage earner, Patrick J. McMorrow, and so is not entitled to widow's benefits. Although expressed as an affirmative finding of a negative fact, the court reads the finding as one that plaintiff had failed to carry her burden of persuasion to establish her status as the widow of the deceased wage earner.

The standard applicable before the agency for this purpose is set out in the Regulations of the Social Security Administration, 20 CFR §§ 404.708, 404.709. That standard requires a claimant to establish eligibility to

receive benefits by "preferred evidence" or, if it is not available, by "other evidence" which is "convincing". Since benefit proceedings are unilateral and non-adversary, much as applications for patents are, the expression is taken to be the functional equivalent of a preponderance of the evidence in an adversary setting, coupled, perhaps, with the concept of consistency of the evidence.

Since the agency has the responsibility to see to it that public funds are disbursed only to those entitled to receive them by law, the expression probably calls for something more than might be sufficient to make out a "proof case" on an application for default judgment under F.R.Civ.P. 55(b)(2), but not much more. The United States does have some protection against concocted claims by reason of 18 U.S.C. § 1001.

■ The entitlement provision is found in 42 U.S.C. § 402(e)(1). It entitles the "widow" of a deceased wage earner to insurance benefits on his social security account if she has attained age 60, has applied for widow's benefits, and is not entitled to equivalent insurance benefits on her own social security account.

The term "widow" is defined by 42 U.S.C. § 416(c) as the surviving wife of an individual, who was married to him for at least 9 months before his death. There are other alternative definitions not applicable here.

The law governing the status of marriage, and other facets of family law such as annulment, divorce, custody of children, alimony, support and maintenance, equitable distribution, and the like, has historically been governed by the law of the States and not by federal law. The federal district courts do not ordinarily deal with such matters. See *Watson v. Manhattan etc. Authority,* 487 F.Supp. 1273 (1980); *Johanning v. Johanning,* 509 F.Supp. 770 (D.N.J. 1981). The authority to deal with that branch of the law is no doubt among the powers reserved to the States by Amend. X, U.S. Const.

However, in the exercise of its delegated powers, the Congress is undoubtedly authorized to deal with subjects ordinarily matters of state law as an incident to its delegated powers. See *U.S. Const.* Art. I, sec. 8, cl. 18 (the "necessary and proper" clause). Thus, in carrying out federal powers by the enactment of the Social Security laws, it is necessary and proper for the Congress to define the term "widow", and to establish modes of proof thereof, in connection with claims for "widow's benefits" created by the statute to be executed and administered.

Such provisions, then, are a matter of federal law, not state law, even though in the process the Congress directs that state law be looked to in one particular or another.

Thus, whether a claimant is a "widow" for the purpose of entitlement to federal funds as widow's benefits is governed by 42 U.S.C. § 416(h). That section sets out a number of tests or standards which, if met, establish a claimant as a "widow". These are:

...If the courts of the State in which the deceased wage earner was domiciled at death would regard the parties as validly married at that time; or

...If the claimant would have the status of a widow under the laws of intestacy applicable to the personal property of the deceased wage earner; or

...If the applicant, in good faith, participated in a ceremonial marriage resulting in a purported marriage with the deceased wage earner which would have been a valid marriage but for the existence of an impediment thereto which was not known to the applicant at the time of the ceremony, AND if the applicant and the deceased wage earner were living in the same household at the time of the latter's death.

This third alternative is limited. It has no application if another applicant is found eligible for widow's benefits under either of the first two alternatives. See 42 U.S.C. § 416(h)(1)(A) and (B).

Despite the language used in the statute, such as "widow" and "valid marriage", it is plain from the setting that the Secretary does not determine marital status or widowhood in the same sense that would be involved in a direct proceeding in a State court, but only in a collateral way to pass on eligibility for widow's benefits under the Social Security Act. Thus, a claimant may be eligible under the third alternative yet fail to establish a widow's status under State law for other purposes. The reverse may also be true in particular cases.

Thus, the issue on this review is whether the record shows substantial evidence to support the final decision that plaintiff had failed to establish that she was the widow of Patrick J. McMorrow and consequently not entitled to widow's benefits under the Social Security Act.

*The facts of record.*

Putting to one side items in the record adverse to plaintiff's claim, including matters of credibility, the evidence adduced in support of her claim showed the following history.

Plaintiff was born April 15, 1910 in Ohio as Isabel R. DeLeo, and had S.S. No. 579–09–5890 on her own account (Application for Retirement Benefits filed 6/16/77, Exh. AC–4, Tr. p. 176; Application for Supplemental Security Income filed 3/9/78, Exh. AC–6, Tr. p. 183).

Patrick J. McMorrow was born November 24, 1905 in New York, and had S.S. No. 107–32–8696 on his account (Application for Retirement Insurance Benefits filed 9/17/71, Exh. AC–3, Tr. p. 172). He died on September 22, 1978 at Holy Name Hospital in Bergen County, N.J. of an acute myocardial infarction due to arteriosclerotic heart disease, with chronic obstructive lung disease as a contributing factor (Certificate of Death, Exh. 5, Tr. p. 103).

DeLeo and McMorrow met in New York. He was living at the time on 96th St., and she lived on 72nd St. (Tr. p. 48) (Tr. p. 57). They met in a restaurant and had breakfast together a couple of Sundays, and she told him she had just come out of a hospital where she had been about 3 years for a mental breakdown (Tr. p. 58).

McMorrow had a vacation and told her he loved her well enough to marry (Tr. p. 49). They drove from New York to Provincetown (Cape Cod), Mass. with a fishing buddy of McMorrow's, Melvin Davis, who lived in New York where he ran a poodle shop. (Tr. pp. 48, 49, 57).

They were married in the middle of May, 1953, the 14th or the 15th, at the home of a Mr. & Mrs. Thompson by a Protestant minister (Tr. pp. 45, 46, 47, 51, 61). There were about 15 people present: Mr. Davis, Mr. & Mrs. Thompson and their son, and mostly all fishing friends. There was a wedding reception or party with beer, liquor and dancing to piano and string music. DeLeo does not drink at all; McMorrow only drank beer. They were married before noon and after the reception or party, the others went down to the beach to fish about 5 or 6 o'clock. (Tr. pp. 50–59).

They stayed in Provincetown maybe a couple of months, then returned to her apartment on 72nd St. and West End Avenue in New York where they stayed about 3 years. Then they moved to an apartment in the Bronx, and then to a house in Bogota, N.J. (Tr. pp. 45, 48, 56, 69, 70).

Since the marriage, they always lived together as man and wife (Tr. p. 59) for 25 years until he died in 1978 (Tr. p. 46). See also the statements of neighbors in Bogota (Tr. pp. 118–128).

Plaintiff does not have a marriage certificate; McMorrow carried the papers, but there was a fire at the 72nd Street apartment and a lot of the papers were burned (Tr. 55, 75). No records were found at Provincetown. A friend, Mr. John Jason, looked into the records and couldn't find anything (Tr. pp. 55, 90). A few years after the ceremony, she heard there was a big fire there (in Provincetown) where a lot of those things got burned. (Tr. pp. 55, 75, 76). The Thompsons have died (Tr. p. 62). The officiating minister was killed in a car accident according to Mr. Jason (Tr. p. 90; Exh. 30, Tr. pp. 163–165).

For corroboration of the testimony that a ceremonial marriage was performed, plain-

tiff offered a question-and-answer interview of Mr. Mel Davis, conducted by plaintiff's attorney on January 3, 1980 at the Mel Davis Dog Boutique, 320 East 49th St., New York, N.Y. and sworn to by him January 18th, 1980 (part of Exh. 27, Tr. pp. 5–8).

Other items in the record tending to contradict the foregoing account or raising matters of credibility, weight and the like, are discussed later.

*Proof of marriage.*

The commonest mode of proof of a ceremonial marriage, oddly enough, is by hearsay, namely the marriage certificate issued by the performing official, and such hearsay is regularly received despite the availability of the declarant. See 5 Wigmore, "Evidence", §§ 1644, 1645 (Chadbourn rev. 1974); Fed.Ev.Rule 803(12); N.J.Ev.Rule 63(18); *Belazinski v. Lebid,* 65 N.J.Super. 483, 168 A.2d 209 (App.1961).

Another mode, also admissible hearsay, is by a copy of an official record, as of a municipal clerk or registrar of vital statistics, or of religious organizations, see Fed. Ev.Rules 803(8), 803(9), 803(11); N.J.Ev. Rules 63(13), 63(15), 63(16), 63(17).

Statements of fact concerning personal or family history contained in family Bibles and the like, have long been admissible hearsay in the courts. See 5 Wigmore, "Evidence", §§ 1495, 1496 (Chadbourn rev. 1974); Fed.Ev.Rule 803(13); N.J.Ev.Rule 63(23).

Hearsay statements in regard to birth, marriage, divorce, legitimacy, ancestry, relationship by blood or marriage or other matters of family history, including reputation testimony, is admissible, sometimes limited to cases where the declarant is unavailable and sometimes not, see 5 Wigmore, "Evidence", §§ 1480–1503 (Chadbourn rev. 1974); Fed.Ev.Rules 803(14), 804(b)(4); N.J. Ev.Rules 63(23), (24), (25), (26), (27).

Under the Regulations of the Social Security Administration, modes of proof are specified for establishing a valid "ceremonial marriage". The kinds of preferred evidence listed are:

... for a (living) spouse's benefits, signed statements from the applicant and the insured about when and where the marriage took place;

... for a lump-sum death payment as surviving spouse, the applicant's signed statement about when and where the marriage took place;

... for any other kind of benefit (e.g., widow's monthly benefits, as here), or if there is evidence causing some doubt about whether there was a ceremonial marriage, then (a) a copy of the public record of marriage, or (b) a certified statement as to the marriage, or (c) a copy of the religious record of marriage, or (d) a certified statement as to what the record shows, or (e) the original marriage certificate.

If "preferred evidence" of a ceremonial marriage as described above cannot be obtained, the applicant is asked to explain why and to provide a signed statement of the clergyman or official who held the marriage ceremony, "or other convincing evidence of the marriage". See 20 CFR § 404.725.

Another section, 20 CFR § 404.727 deals with proof of a "deemed" valid marriage, i.e., one considered valid even though the State law procedures were not correctly followed, or where a former marriage had not yet ended. For this, five elements of "preferred" evidence are called for and, if the applicant cannot obtain them, he or she will be asked to explain why and to provide "other convincing evidence of the marriage."

None of the forms of preferred evidence specified to support an application for a widow's monthly benefits was provided to the agency. Only "other evidence", required by the Regulations to be "convincing", was offered. The original marriage certificate issued by the minister was not presented. No copy of an official record of the church, the town clerk or the register of vital statistics was presented. The reputation testimony of Bogota neighbors could not serve as proof of a ceremonial marriage in Provincetown, Mass. because the declar-

ants are not shown to have been part of the community in which the claimed ceremony took place. That reputation testimony could have been probative of the fact of a common law marriage if that kind of marriage could legally be shown, which it could not for reasons discussed later.

'The evidence that was offered was the direct evidence of the plaintiff that she was present and participated in the ceremonial marriage, and the sworn affidavit of Mel Davis that he was present on the occasion. If this was all the evidence, and if other matters were not in the record, the court would be inclined to rule that the decision of the Secretary was not supported by substantial evidence.

*Common law marriage.*

From its first existence as an English colony, Massachusetts has never recognized common law marriages as valid. An early case is *Milford v. Worcester,* 7 Mass. 48 (1810), reviewing the early ordinance of 1646 and the statutes thereafter. *Commonwealth v. Munson,* 127 Mass. 459 (1879) traces in considerable detail the Massachusetts history which has always required a ceremonial marriage actively solemnized by an authorized official for the marriage to be valid. It requires the publication of notice (banns) before the license may issue. The only exception noted was one enacted in 1786, authorizing marriages between those who were Quakers or Friends in the manner and form practiced in their societies (i.e., without an actively officiating minister), but even for that exception the ceremony must be witnessed, recorded and returned by the principal officer of the meeting at which the ceremony was performed.

The recent decision in *Heistand v. Heistand,* 384 Mass. 20, 423 N.E.2d 313 at 316 (1981) verifies that this is still the law of Massachusetts.

New York recognized common law marriages for most of its history, but by N.Y.P.L.1933, c. 606, effective April 29, 1933, section 11 of the Domestic Relations Law was amended to abolish common law marriages sought to be entered into thereafter. See *People v. Heine,* 12 N.Y.A.D. 36, 208 N.Y.

Supp.2d 188 (1960) and earlier cases cited there.

In New Jersey, the common law marriage was recognized until November 30, 1939. By N.J.P.L.1939, c. 227, the Legislature amended N.J.R.S. 37:1–10 to provide that "no marriage contracted on and after December 1, 1939 shall be valid unless the contracting parties shall have obtained a marriage license * * * and unless, also, the marriage * * * shall have been performed by or before any person * * * authorized * * * to solemnize marriages; and failure in any case to comply with both prerequisites aforesaid, which shall always be construed as mandatory and not merely directory, shall render the purported marriage absolutely void."

■ The evidence offered by plaintiff tended to show that Patrick J. McMorrow was domiciled in New Jersey at his death in 1979. Under federal law, as expressed in 42 U.S.C. § 416(h), the law of New Jersey is to be looked to to determine whether any of the three alternative tests or standards mentioned above was met so as to qualify plaintiff as decedent's "widow" within the meaning of the Social Security Act. This requires examination of New Jersey's conflict of laws rules where the marriage occurred elsewhere, as claimed here.

■ On this point, the law of New Jersey has long been that the form or method of contracting marriage is regulated by the law of the sovereign where the marriage takes place, and if the marriage is valid there its validity is everywhere recognized. *Smith v. Smith,* 52 N.J.L. 207, 19 A. 255 (E. & A. 1889); *Scularekes v. Gullett,* 106 N.J.Eq. 369, 150 A. 826 (Ch.1930). This rule does not apply to polygamous or incestuous marriages, see Francis Child, "The Law of Divorce in New Jersey", p. 30 (Soney & Sage, 1932).

From the history presented by plaintiff and summarized above, she and Patrick McMorrow, while domiciled in New York, spent a month or two in Provincetown, Mass. from about mid-May, 1953, at the start of which a ceremonial marriage took

place. If valid there, that marriage would be recognized as valid by New Jersey. Because of the tenor of Massachusetts law, the claimed marriage could be valid only if ceremonial according to the requirements there; a common law marriage would not be valid there and so would not be recognized in New Jersey.

The parties returned to New York where they resided until they moved to Bogota in 1958, some 5 years later. If they were not validly married in Massachusetts, they could have been so married in New York. But at the time, New York had outlawed common law marriages, and no claim or evidence of a ceremonial marriage in New York is in the record.

Upon moving to New Jersey in 1958, a valid marriage could have been contracted here if there were not one already. But at that time and thereafter, New Jersey no longer allowed common law marriages to be entered into, and there is no claim or proof of a ceremonial marriage in New Jersey.

Because of the facts relied on and the law of all three states applicable thereto, plaintiff's status as an eligible widow under the Social Security Act depends entirely on the presentation of "convincing" evidence, other than "preferred" evidence, of the ceremonial Massachusetts marriage.

*Impediment to the marriage.*

On September 17, 1971 Patrick McMorrow filed an application for retirement insurance benefits on his own account, S.S. No. 107–32–8696. In that application he said he was married, but separated for over 30 years. He gave his wife's maiden name as Margaret McGinley, born September 13, 1908, and the date of marriage as June 30, 1940. He said, "I have no idea where she resides". He said he had no children eligible for benefits. He said he had been employed by the N.Y. City Department of Sanitation before 1970 and was no longer working. He said his marriage was performed by a clergyman or other public official and that he had not been married before. He gave his mailing address as 720 Fort Washington Ave., New York, NY, 10040, and his phone as CI6–2988.

In her testimony, the plaintiff said she knew nothing of McMorrow's earlier marriage in 1940 at the time of the Provincetown ceremony in 1953. She said he told her a few years later that he was married before and "promised me" [sic] not to tell his sisters because they were all Catholic, and "we were married under a Protestant...". He didn't want to tell her from the beginning. When she found out, two years later, she remained married to him (Tr. pp. 59–61, 79). At about this time (a few years after the wedding), McMorrow was going up to Provincetown to go fishing and she asked him "to pick up the papers again because our other papers got burnt." When he came back, he said, "Everything is destroyed there was a fire down there."

The administrative law judge, in his decision of October 16, 1979, ruled as to the Provincetown ceremony:

> "Even if a ceremonial marriage took place, it could not have been valid since Mr. McMorrow's prior marriage was never ended". (Tr. p. 25).

In the recommended decision of December 29, 1980, another administrative law judge referred to the 1940 marriage mentioned in the 1971 application and noted that Mr. McMorrow made no mention of any later marriage and that there was no record of a divorce decree (Tr. p. 14). The decision of the Appeals Council, dated November 14, 1981, also makes reference to this information (Tr. p. 10).

If these references were intended, in the final decision below, to reflect a finding that because Mr. McMorrow had reported an earlier ceremonial marriage, and because there was no evidence to show it had ended while he was still alive (whether by death, annulment or divorce) the plaintiff "could not" be the lawful wife and widow of McMorrow, it would have been erroneous as a matter of law.

This is because the first alternative test or standard specified by 42 U.S.C. § 416(h) necessarily draws in State law as controlling the outcome of the federal eligibility requirement.

Under these circumstances New Jersey disposes of the conflicting presumptions of (a) the continuance of life of a first spouse and of (b) innocence of the crimes of bigamy or adultery, by giving prevailing weight to the latter over the former. *Tyll v. Keller,* 94 N.J.Eq. 426, 120 A. 6 (E. & A.1923); *Keller v. Linsenmyer,* 101 N.J.Eq. 664, 139 A. 33 (E. & A.1927); *Schuler v. Schuler,* 114 N.J.Eq. 220, 168 A. 468 (E. & A.1933); *Booker v. James Spence Iron Foundry, Inc.,* 80 N.J.Super. 68, 192 A.2d 860 (App.1963).

Where the first spouse is shown to be still alive, of course, this selection of presumptions cannot come into play. See *Wieczoreck v. Folsom,* 142 F.Supp. 507 (D.N.J. 1956). For a very recent decision of the Supreme Court in a case advancing a claim under the Wrongful Death Act, see *Newburgh v. Arrigo,* 88 N.J. 529, 443 A.2d 1031 (1982).

However, the court is satisfied on a review of the entire record that the final decision challenged here did not rest on such a determination but concluded, instead, that due to serious challenges of credibility, plaintiff had failed to prove that the alleged ceremonial marriage ever took place.

The information given by Patrick McMorrow about his 1940 marriage is pertinent in this case not so much on the theory that an existing marriage to another would fully preclude validity of the 1953 marriage but because it was evidence causing some doubt whether there was a ceremonial marriage in 1953. For that reason, as well as because plaintiff was applying for widow's insurance benefits, 20 CFR § 407.725(b)(2) applies, and the "preferred" evidence is a contemporaneous record or a certificate of the tenor of that record.

Since there was no such preferred evidence, plaintiff was called upon by § 407.-725(c) to explain why the preferred evidence could not be obtained (she did this through her testimony of the fire at 72nd Street, and the fire at Provincetown reported by Patrick several years later when she asked him to get replacements for the burned papers), AND to provide a signed statement of the clergyman or official who held the marriage ceremony (this was not provided) OR "other convincing evidence of the marriage".

The general description of "preferred evidence" and of "other evidence" is given in 20 CFR § 404.709 in plain English. It is explained there that if "preferred" evidence is given, it will generally be found to be convincing evidence. "This means that unless we have information in our records that raises a doubt about the evidence, other evidence of the same fact will not be needed." When preferred evidence is not available, any other evidence given will be considered. If the other evidence all shows the same information (i.e., is corroborative and consistent) it may be convincing evidence even though it is not preferred evidence.

If the other evidence is not convincing by itself, additional evidence will be asked for. If that evidence, together with that already given, shows the same information, all of it together may be convincing. When there is convincing evidence of the facts that must be proven, or when "it is clear that the evidence provided does not prove the necessary facts", a formal decision is made.

The entire formulation of the regulations on evidence, from § 404.701 through § 404.-780, originating in 43 FR 24794, June 7, 1978, is in the style of simple English or plain English, in the first and second person. It may be that the word "convincing", particularly when used in respect to what will often be evidence of a hearsay nature about past events, is intended to convey the concept of trustworthiness in the sense commonly used for hearsay exceptions. If this is so then it articulates, most likely, a burden of persuasion essentially the same as a preponderance burden, rather than the "clear and convincing" burden sometimes applicable in the courts.

*The Credibility and Inconsistency Aspects.*

■ The decision of the Appeals Council noted that when Patrick filed his own retirement application in 1971, he gave the information described above, reporting the 1940 marriage to Margaret McGinley, giv-

ing no indication of its termination and making no mention of the 1953 marriage. (Exh. AC–3, Tr. pp. 172–175).

It also noted that when plaintiff later filed her own application for retirement benefits on her own account in 1977, she used her maiden name, DeLeo, and described herself as "single" (Exh. AC–4, Tr. 176–179). When a claims representative wrote her for information and addressed her as "Mrs.", she replied and signed her name "Miss", along with a note that she was not "Mrs." but "Miss". (Exh. AC–5, Tr. 180–182).

It also noted that in early 1978 plaintiff filed for supplemental security income benefits also as DeLeo, single, on her own account. She said she lived in "rooms" in the attic of a small cape cod house and paid $125 a month rent to her landlord, Patrick McMorrow, who was not related to her. She also said she owned no real estate, and that she lived with Mr. & Mrs. Patrick McMorrow. (Exh. AC–6, 7, 8, Tr. pp. 183–194).

A claims representative wrote to Mr. McMorrow for verification and he replied that plaintiff was a boarder and that they were not related (Exh. AC–9, Tr. p. 195).

The 1958 contract to buy the Bogota house was in evidence as Exh. 7 (Tr. pp. 106–107). The buyers were named as "Patrick McMorrow and Rita E. McMorrow, his wife", residing at 860 E. 175th St., New York, N.Y. However, the deed was made to "Rita DeLeo" alone (Exh. 8, Tr. pp. 108–112).

In a statement given by plaintiff, she said the house was in her maiden name because his family gave them "such a hard time and I didn't want any problem with them claiming the house if I had it in the name McMorrow". She also said, "I will ask original attorney for a statement on this matter." (Exh. 25, Tr. p. 147).

The deed was on a form with the printed name of Thomas A. Tinghino, a Hackensack attorney (Tr. p. 108) who took the sellers' acknowledgement (Tr. p. 111). He was also a neighbor and gave a statement dated September 9, 1978 (Exh. 12, Tr. p. 118), but the record shows no statement from him about taking title in her maiden name.

An inquiry by telephone was made by C.A. Marshall at the Hyannis office on December 26, 1978 (Report of Contact, Exh. 17, Tr. p. 125). The inquiry was of the town clerk at Provincetown.

The person called said she knew Patrick McMorrow and as far as she knew he did not get married in Provincetown. She checked all the marriage index under both names and came up with nothing. She also said McMorrow came from out of state and she assumed he was married in the State he came from but was not sure what State that was. The person called is not indicated to have mentioned any fire causing the loss of records.

Plaintiff's application for widow's insurance benefits was filed September 28, 1978 (Exh. 1, Tr. pp. 92–96), six days after McMorrow's death. For the first time in her applications she reported having been married to McMorrow on May 15, 1953 in Provincetown in a ceremonial marriage.

The application was denied April 26, 1979 on the ground that she had not submitted sufficient evidence to establish a ceremonial marriage (Exh. 2, Tr. p. 97).

Her request for reconsideration was filed May 30, 1979 (Exh. 3, Tr. p. 98). With it she submitted a letter, dated June 28, 1974, from the N.Y. City Employees' Retirement System to Mr. McMorrow at a N.Y. City address, listing his retirement benefits. Included in the data is the entry: "Beneficiary: Rita McMorrow, your wife". (Exh. 6, Tr. pp. 104–105). She also said in Exh. 3 that she would submit a "statement regarding marriage (to be secured from Mr. & Mrs. Peter & Mary Ryan, brother-in-law and sister of Patrick McMorrow". That statement is not in the record, and evidently was not submitted.

The claim was again denied on reconsideration on July 2, 1979, with the determination by the chief of the section (Exh. 4, Tr. pp. 99–102). He concluded that a ceremonial marriage had not been shown to exist,

and also that she had said in her earlier application for a lump sum death benefit (Exh. 20, filed 3/30/79, Tr. pp. 131–134) that McMorrow had earlier married Margaret, had lived with her about two weeks, and that the first marriage had "never ended". She said she had learned of it 4 years after her own marriage.

In a "Statement of Claimant" dated September 28, 1978 (probably submitted before the first denial of benefits) what she said about the marriage was:

"I have no marriage certificate. I think we were married May 15, 1953. I do not remember the exact date. My husband and I never celebrated our anniversary. We have no children. We were married in Provincetown, Massachusetts * * * The couple that stood up for us are now dead. No one else was present except for the clerk that married us" (Exh. 10, Tr. pp. 114–115).

In a "Statement of Claimant" dated October 4, 1978 (with which she evidently submitted the retirement letter, Exh. 6), she said: "There is no one alive who has knowledge of our marriage." (Exh. 11, Tr. p. 116).

In a later statement dated May 10, 1979 (Exh. 21, Tr. pp. 135–136) she said, "The minister is deceased. The 2 witnesses to our marriage are both deceased. They were Mr. & Mrs. Harry Thompson—both deceased—they owned the house we lived in. * * * Mr. & Mrs. Thompson were there and we had a private Protestant ceremony * * * It was 5/15/54 [sic]. We lived there in a little cabin and after a few years we moved back to N.Y. * * * There we had a fire and lost everything. I do not know why or where the marriage license is if it is not in Mass. He seemed to have taken care of everything. I don't remember signing anything and I didn't get a blood test because I was just out of the hospital. He never said anything about other marriage or anything.

"5/15/54 [sic] was, I think, kind of a cloudy day. A quiet ceremony in a small side street in Provincetown. Then we walked to the beach. No [sic] party or anything, * * * "

Melvyn E. Davis wrote out two undated, unsworn statements on a blank Blumberg form T–117 "Blank Affidavit". In the clearer one (Exh. 22, Tr. p. 137) he says he knew Mr. & Mrs. McMorrow for 25 years, since 1954 [sic] and had been a very close friend with them. He says that when Pat died in 1978, he was still very close to his wife and is still a very dear friend. He says they were a very devoted and happy couple and "any help I can give his widow I will do."

The less legible one (Exh. 24, Tr. p. 142) is worded verbatim the same except that a new sentence follows the first one in which he says: "I stood up for them at their wedding and was a witness to same".

A statement by him on a "Statement Regarding Marriage" form dated June 22, 1979 (Exh. 23, Tr. pp. 140–141) says he knew Mr. McMorrow since 1954, and the plaintiff since 1952. He says he met Mr. McMorrow, and the plaintiff, about two times a week for social times. He says: "I stood up for them at their wedding on May 15, 1954 [sic] in Provincetown, Mass."

In her own "Statement of Claimant" (Exh. 23, pp. 138–139) plaintiff says that Davis was a witness at the wedding; "He was a member of the wedding party and stood up for us." She gives the date as 5/15/54 [sic] and the place as Provincetown "in the minister's home. I don't remember his name."

In another "Statement of Claimant" (Exh. 25, pp. 143–148) plaintiff said of the marriage circumstances:

"When we started to live together we resided in Provincetown, Mass. I do not remember who married us. I know it wasn't in church but it might have been a town official or a justice of the peace. * * We rented a room in Provincetown for a few months. I became sick and entered the Kings Park Hospital, New York State. I stayed there under my own name as I didn't want Patrick's family to know of the mental problem. When I came out of Kings Park Hospital we lived together in the Bronx for a few years. * * * We went to live * * * at 341 W. 72nd near West End Ave. * * * for 4

years * * *. After that we moved to * * Bogota. * * * "

The sworn interview of Mr. Davis, mentioned above (Tr. pp. 154–157) was taken in January, 1980. In this statement he says he knew both Rita and Pat for 27 years, and that she introduced Pat to him in his store when they were given a dog. He said they were keeping company at the time and were married about a year and one half later. He was invited to the wedding; they drove up together to Cape Cod. It was about May 15, 1974, [sic] and it was a gorgeous day. Pat and Rita took him to the Justice of the Peace in Cape Cod. Rita's friend, Mrs. Thompson was with them. The ceremony took 15–20 minutes, after which they had dinner at the Thompson's house.

Plaintiff's attorney submitted a weather report for May, 1954 recorded by an observer at the U.S. Coast Guard, Chatham, Mass. showing no fog on the 15th. (Exh. 29, Tr. pp. 161–162). Rain and fog are recorded for May 16th (Idem.).

The record also contains a letter from John Jason, Jr. of Provincetown, postmarked April 20, 1979, describing his unsuccessful efforts to locate a record of the marriage license at the town hall and the church. He does not mention any fire that burned records (Exh. 30, Tr. pp. 163–165).

*Conclusion.*

The recommended decision of the ALJ, dated December 29, 1980, and the decision of the Appeals Council dated November 14, 1981, which adopted that report and supplemented it with evidence already in the Agency record, are expressly grounded on credibility grounds.

The sampling of information, summarized above, clearly shows substantial evidence on which a reasonable mind could rationally conclude that the "other evidence" of a ceremonial marriage lacked credence.

Aside from the lack of support for the suggestion of a fire burning town records, and aside from the change in date from 1953 to 1954 and then back again to 1953, it is only necessary to read the testimony of December 1, 1980 giving an account of the conversation with Mr. Davis that led to the production of his statements when plaintiff had previously said the Thompsons were the only witnesses, to appreciate the significance of the credibility issue (Tr. pp. 82–87).

Plaintiff also argued to the Appeals Council (Exh. AC–15, Tr. pp. 211–212) that it could not properly consider the additional records obtained from Agency files (Exh. AC–14, Tr. pp. 209–210) and which became the AC series of exhibits. The Appeals Council ruled otherwise, and its ruling was correct as a matter of law. See 20 CFR § 404.709, explaining that when "preferred evidence" is given, other evidence of the same fact will not be needed to achieve the level of "convincing" evidence, "unless we have information in our files that raises a doubt about the evidence."

Not only did the file information raise a doubt, but the doubts raised were aggravated and enhanced in the respects outlined above.

Submit order affirming the final decision of the Secretary.