# United States Court of Appeals
## For the First Circuit

No. 03-1036

SAMUNA YONGO,

Petitioner, Appellant,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent, Appellee.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Oberdorfer,[*] Senior District Judge.

Jeffrey W. Goldman with whom Melissa A. Woodard and Testa, Hurwitz & Thibeault were on brief for petitioner.
Beth J. Werlin with whom Nadine K. Wettstein, Mary A. Kenney, American Immigration Law Foundation, Iris Gomez, Massachusetts Law Reform Institute, Harvey Kaplan and Kaplan, O'Sullivan & Friedman, American Immigration Lawyers Association, New England Chapter, were on brief for American Immigration Law Foundation, Massachusetts Law Reform Institute and American Immigration Lawyers Association, New England Chapter, Amici Curiae.
Margaret Perry, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, and Mary Jane Candaux, Senior Litigation Counsel, were on brief for respondent.

January 14, 2004

[*]Of the District of Columbia, sitting by designation.

**BOUDIN, <u>Chief Judge</u>**.  Samuna Yongo, an asylum seeker from the Democratic Republic of the Congo (formerly Zaire) who is the petitioner in this case, arrived in Boston by air from Europe in January 1997.[1]  He held a passport in the name of Masamuna Eduardo and claimed to be that person.  When challenged by immigration authorities, he admitted that this was not his passport.  The INS began an exclusion proceeding on the ground that he was an alien who had no valid entry document and had used a fraudulent passport and visa.  8 U.S.C. §§ 1182(a)(6)(C)(i) & (a)(7)(A)(i)(I) (2000).

Yongo conceded that he was subject to exclusion, but in April 1997 he filed an application for asylum as one who had been persecuted and had a well-founded fear of future persecution.  8 U.S.C. §§ 1158 (2000).  <u>See</u> <u>Yatskin</u> v. <u>INS</u>, 255 F.3d 5, 9 (1st Cir. 2001); 8 C.F.R. § 208.13(b)(2003).  At that time, Zaire was governed by a long-time ruler, Mobutu Sese Seko ("Mobutu"), who was overthrown in May 1997.

In support of his application, Yongo testified in an asylum hearing held in July 1997 before an administrative law judge ("ALJ") that in the early 1990s, Yongo had been a member of a pro-democracy group opposing Mobutu; that he (Yongo) had been arrested in May 1994 for distributing political pamphlets and arbitrarily

---

[1]Zaire is the name used in 1997 for what was formerly the Belgian Congo and is now the Democratic Republic of the Congo.  The Democratic Republic of the Congo lies immediately east of the Republic of the Congo, a separate country often referred to as the Congo.

jailed for 10 months; that he had been released in March 1995 after promising to cease his opposition to Mobotu but had been arrested and imprisoned again in July 1995 after joining in a political parade; and that on both occasions, he had been interrogated about his political activities and physically abused.

Yongo further testified that in late June 1996, he had escaped from prison with the help of his father; fled to the Congo for five months; left the Congo in mid-November 1996 with the help of a guide paid by his father; traveled in Portugal, France, and Germany (for 13 days); and then visited Holland before flying to the United States in January 1997. He said that this was his first application for asylum and that he had not sought asylum or refugee status in Germany.

At a further hearing in September 1997, both sides tendered new evidence. Yongo offered a birth certificate and medical record--the latter to show that he had had malaria (as he had earlier claimed) on his second release from prison; the INS noted that the first document was not authenticated and the second contained hearsay. The ALJ accepted the two documents, saying he could not give them much weight given the inability to authenticate them.

In the same hearing, the INS offered two documents: one was a request from an INS officer in Boston to INS officials in Germany and the other was a reply from an INS officer based in

Germany reporting on his review of German immigration records showing (according to his report) the following: that in late June 1996--when Yongo had testified he was hiding in the Congo--an alien with Yongo's name and date of birth had been arrested near Frankfurt and had applied for asylum. This report was later superceded by more detailed information, as explained below.

In the September 1997 hearing, Yongo flatly denied that he had been near Frankfurt or applied in Germany for asylum. He suggested that some imposter had used his name and identification or that the records pertained to an unknown relative with the same name. Saying that he was concerned about Yongo's credibility, the ALJ asked the INS to see whether German immigration records contained a photograph. He told the INS to serve Yongo with any information obtained, promising Yongo a chance to offer new evidence in response.

The INS then filed and served many pages of copies and translations of purported official German immigration records including a signed asylum application, photograph and fingerprint records. In response, Yongo's counsel filed a letter conceding that the fingerprints, photograph and signature were those of Yongo but denying that Yongo had been in Germany at the time; instead, the letter said, the explanation lay in efforts of Yongo's father to obtain German documentation for Yongo.

-4-

At the resumed hearing in May 1998, an INS officer testified to the authenticity of the documents. He said that he had served for five years (ending in December 1997) in the INS office in Frankfurt; was familiar with German immigration record-keeping; and had received the documents now offered from a German Border Patrol Officer who had acquired them from official files. These records showed, he said, that Yongo had been arrested in Frankfurt and applied for asylum in Germany in June 1996. He also opined that the records could not have been fabricated and that German immigration records were extremely accurate.

Yongo then testified that the records contained his fingerprints, photograph and signature but he continued to deny that he had ever been in Frankfurt or had applied for asylum in Germany. Rather, he explained, he had been hiding in the Congo at the time and he now remembered having been photographed and fingerprinted there in mid-August 1996 by men hired by his father to provide false German documents for Yongo--men whom he had never heard from again. Yongo did not explain how this squared with German records saying that he had been in Germany two months <u>before</u> the alleged encounter in the Congo.

At this point, the ALJ said that he found the case "difficult" because if Yongo's claims as to his treatment were true, they would likely warrant asylum. Although by this time Mobutu had been out of power for a year, Zaire then remained in a

state of political unrest.  But the ALJ said that he found that inconsistencies between Yongo's testimony and the German records undercut Yongo's credibility, warranting denial of his asylum claim.

Yongo appealed to the Board of Immigration Appeals challenging, in particular, the admission of the German documents and the finding that Yongo was not credible.  Under new procedures adopted in 1999, a single member of the Board issued a so-called streamlined decision affirming without opinion the decision of the ALJ, and designating the ALJ's decision as the final agency determination for the purpose of judicial review.  8 C.F.R. § 1003.1(e)(4)(2003)(formerly 8 C.F.R. § 3.1(e)(4)).  Yongo has now sought review in this court; under the new procedures, we review directly the decision of the ALJ.  Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir. 2003); Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003).

Yongo's first claim on appeal--which we review de novo, Aguilar-Solis v. INS, 168 F.3d 565, 568 (1st Cir. 1999)--is that the ALJ violated Yongo's constitutional right to due process of law by relying upon unauthenticated documents, hearsay presented by the testifying INS officer, and opinions (of the same officer) offered by one not properly qualified as an expert.  The Federal Rules of Evidence do not apply in INS proceedings, Henry v. INS, 74 F.3d 1, 6 (1st Cir. 1996), but the less rigid constraints of due process

impose outer limits based upon considerations of fairness and reliability.[2]

We might dispose of Yongo's claims or alter the standard of review for lack of timely objections by Yongo; but, as there is some dispute about whether there were adequate objections and either way the result is the same, we will assume for argument's sake that the objections were preserved. Many of the claims could also be deemed mooted by Yongo's admission that the German records are genuine; but the admission was arguably prompted by a need to respond to documents and testimony that he says should not have been admitted.

We start with the authentication issue on which Yongo's claim for reversal principally rests. Unfortunately for Yongo, authentication is also the most practical and flexible of the three relevant doctrines. In substance, authentication requires nothing more than proof that a document or thing is what it purports to be and, even though the Federal Rules of Evidence spell out various options, the rules also stress that these options are not exclusive and the central condition can be proved in any way that makes sense in the circumstances.[3]

---

[2]Felzcerek v. INS, 75 F.3d 112, 115 (2d. Cir. 1996); Espinoza v. INS, 45 F.3d 308, 310 (9th Cir. 1995); Bustos-Torres v. INS, 898 F.2d 1053, 1055 (5th Cir. 1990).

[3]Fed. R. Evid. 901-902; United States v. McMahon, 938 F.2d 1501, 1508-1509 (1st Cir. 1991); 5 Weinstein's Federal Evidence § 901.03 (4th ed. 2003).

Here, the German records were authentic if they were genuine German immigration records, and this latter condition was established by the testimony of the INS officer as to their provenance (that he got them from a German Border Police Official) and appearance (the INS officer was familiar with German immigration records). This evidence is sufficient to authenticate even if we disregarded any further (hearsay) statement of the absent German official as to the origin of the records, namely, his own statement that he had gotten them from official files.

As it happens, the ALJ did not have to disregard that German official's reported statements. In an INS proceeding the ALJ is not bound by formal hearsay rules. Henry, 74 F.3d at 6. Highly unreliable hearsay might raise due process problems, but here there is nothing dubious about the German official's hearsay statement, a statement that dovetails with the non-hearsay report and assessment of the INS officer.

Yongo also objects that the INS should have used the more complex procedure for authentication of documents provided by 8 C.F.R. § 287.6 (2002), but this provision offers "one, but not the exclusive, method" for authenticating a document in an INS proceeding. Iran v. INS, 656 F.2d 469, 472 (9th Cir. 1981); see also Georgis v. Ashcroft, 328 F.3d 962, 969 (7th Cir. 2003). In fact, the subpart in which the regulation appears says that the

regulations do not create "any right, substantive or procedural . . . ."  8 C.F.R. § 287.12 (2002).

Of course, once the documents were admitted, a separate hearsay objection remained insofar as their relevance depended on the truth of statements made in the documents: "authentic" means the document is "real," not that its contents are necessarily "true."  Here, the documents had both non-hearsay and hearsay uses.  Yongo's asylum application, once authenticated, was directly admissible (like a driver's license or marriage certificate) to contradict his claim that he had never sought asylum in Germany.  See Felzcerek v. INS, 75 F.3d 112, 115 (2d. Cir. 1996); McMorrow v. Schweiker, 561 F. Supp. 584, 589 (D. N.J. 1982).

By contrast, so far as the documents purported to record Yongo's arrest in Frankfurt, this would arguably be a use depending on the truth of the matter asserted in the document.  The line is somewhat fuzzy (Yongo's photograph on a record labeled "arrest record" would be an interesting problem).  But even if we assume that the arrest record was in part hearsay, it was hardly so unreliable as to offend due process.  In fact, even in a federal court the contents might well qualify for admission for their truth (we need go no further) under the public records exception.[4]

---

[4]Fed. R. Evid. 803(8); see, e.g., United States v. Loyola-Dominguez, 125 F.3d 1315, 1317 (9th Cir. 1997) (warrants of deportation); United States v. Versaint, 849 F.2d 827, 831 (3d Cir. 1988)(police reports).

-9-

Yongo relies heavily upon Ezeagwuna v. Ashcroft, 325 F.3d 396, 407 (3d Cir. 2003), involving a letter used in an asylum proceeding written by a State Department official, reporting the results of an investigation of the applicant's claims conducted by INS officials in Cameroon--officials who were not present to testify and who were mainly recounting information from third parties. Id. at 406-07. The Third Circuit held that the letter had "absolutely no information about what the 'investigation' consisted of, or how the investigation was conducted" and concluded that for this and other reasons it was unfair to rely upon it. Id. at 408.

In Ezeagwuna, where the story of persecution (if true) was compelling, the reports of the INS field investigation that claimed to establish fraud in the applicant's story were far less solid than the German records in this case. Whether we would have used precisely the same language as the Third Circuit is open to doubt; but anyone who reads that case will see immediately how different it is and how far the test of fundamental fairness turns on the facts. See Felzcerek, 75 F.3d at 115. There is no conflict in the result in our case and Ezeagwuna.

This brings us to the subject of the expertise of the INS officer. His statement that he got the records from a German official required no expertise; nor would it require very formal expertise, but only general familiarity (which the officer had), to

assert that the immigration records were of the kind kept by the German authorities. The only statements requiring genuine expertise were the INS officer's testimony that it would be very hard to smuggle false records into German files and that such German records were "unbelievably accurate."

Neither proposition comes as much of a surprise and both statements were of limited importance in this case: the idea that Yongo's records were smuggled into the files or inaccurate in their contents is (in context of the other evidence) extremely far-fetched. In any case, expertise is a matter of degree and while a federal judge might disallow this testimony unless the INS officer provided more groundwork for his opinion, the ALJ was not bound by strict federal rules of evidence and the officer's opinion testimony was marginal and did not implicate due process concerns.

Yongo's second and separate line of attack comes closer to contesting the ALJ's decision on the merits but, sensibly enough, is cast as a legal issue. The reason for this tactic is that the ALJ, like any fact-finder who hears the witnesses, gets a lot of deference on credibility judgments.[5] Further, absent legal error, the substantial evidence standard applies to the ultimate

_____

[5]We have said that if the ALJ chooses to reject a petitioner's testimony as lacking credibility, he must "offer a specific, cogent reason for [the IJ's] disbelief" with support in the record. El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003) (internal citation and quotation marks omitted). One can imagine exceptions--e.g., claims highly improbable on their face--but the point is that deference is cabined.

-11-

issue of whether petitioner has established a credible fear of persecution, warranting reversal "only when the record evidence would compel a reasonable factfinder to make a contrary determination." Aguilar-Solis, 168 F.3d at 569.

Here, Yongo's basic claim is that the ALJ misinterpreted an important INS precedent, itself bolstered by some case law in the circuit courts, as to the significance of false statements or use of false documents by an asylum seeker. The precedent is In re O-D-, 21 I. & N. Dec. 1079 (BIA 1998), in which the asylum applicant stated that he was fleeing persecution from Mauritania and presented false documents to the INS to prove he was Mauritanian. Id. at 1079-80. The Board offered a double comment on the significance of the fraud.

As a general rule, the Board said that the applicant's use of false documents "submitted to prove a central element of the claim in an asylum adjudication indicates his lack of credibility . . . [and] in the absence of an explanation regarding such presentation, creates serious doubts regarding the respondent's overall credibility." In re O-D-, 21 I. & N. Dec. at 1083. However, O-D- also said that "there may be reasons, fully consistent with the claim of asylum, that will cause a person to possess false documents, such as the creation and use of a false document to escape persecution by facilitating travel." Id.

Focusing upon this latter qualification, Yongo says that in this case the ALJ, who expressly relied on In re O-D-, misunderstood the qualification. Yongo's position, in substance, is two-fold: (1) that the Board does not think that a negative inference as to overall credibility concerning persecution can be drawn from a narrow lie, or use of a false document, to escape persecution; and (2) that any dishonesty by Yongo shown in this case falls within this category.

Both of the lessons of In re O-D- are, if not transmuted into rigid rules, simply common sense. The dictum falsus in uno, falsus in omnibus (false in one thing, false in everything) is a longstanding but overstated precept, Black's Law Dictionary 1636 (7th ed. 1999). Obviously there are some lies that, because of their circumstances and limited relationship to the main issue, do relatively little to discredit other statements. A lie by a fleeing victim to a tyrant's border guard is not the same as a lie under oath in an INS proceeding about the circumstances of persecution. See Akinmade v. INS, 196 F.3d 951, 956 (9th Cir. 1999). The case law recognizes this to be so.[6]

---

[6]Compare, e.g., Bojorques-Villanueva, 194 F.3d 14, 16-17 (1st Cir. 1999), de Leon-Barrios v. INS, 116 F.3d 391, 392-94 (9th Cir. 1997), and Ceballos-Castillo v. INS, 904 F.2d 519, 520 (9th Cir. 1991), with Singh v. Ashcroft, 301 F.3d 1109, 1113 (9th Cir. 2002), Cordero-Trejo v. INS, 40 F.3d 482, 488 (1st Cir. 1994), and Martinez-Sanchez v. INS, 794 F.2d 1396, 1400 (9th Cir. 1986).

The problem for Yongo is his second premise, namely, his claim that his own deceptions fell into the category of those that have no substantial bearing upon the main issue. Of course, the idea of strict categories is itself mistaken; we are dealing with several variables and matters of degree. The better way to view the matter is that Yongo's deceptions were not merely ones that facilitated his escape from Zaire but--and these are two separate points--were both more widespread and not all unrelated to his central claim of persecution.

By the time he was through, Yongo had used a false name and passport to enter the United States; had lied (or so the ALJ could easily find) about never having been in Frankfurt, about seeking asylum in Germany, and about having been in the Congo in June 1996; and had spun a highly dubious tale (or so, again, the ALJ could have thought) about the creation of false German records by friends of his father--a tale designed to explain away the presence of the incriminating German records. This is quite a package and two of the apparent falsehoods are far from merely incidental.

Whether Yongo had previously sought asylum was arguably pertinent to Yongo's ability to qualify for asylum under United States law, 8 U.S.C. § 1158(b)(2)(A)(vi) (2000); 8 C.F.R. § 208.15 (2003), and Yongo's tale of having been in the Congo in June 1996 was part of a narrative that began with his alleged imprisonments

and ended with his supposed escape and flight to Europe and then America.  Of course, Yongo's claims of persecution could still have been true; but there is nothing surprising, let alone inconsistent with any rule of law, in the ALJ's conclusion that Yongo could no longer be trusted as to his central story.

On this appeal, we have considered sua sponte whether in another respect the ALJ may have misread In re O-D- or--and this is the main point--applied a credibility rule that we would regard as irrational.  In his formal decision the ALJ said that In re O-D- provided "some guidance" as to how to assess the discrepancies created by the German records.  Specifically, the ALJ said:

> The Board in that case concluded that presentation of evidence that turned out to be inaccurate has the effect of discrediting the applicant's entire claim, and that in the absence of an explanation or rebuttal, that that indicates an overall lack of credibility regarding the entire claim, and that essentially is the same conclusion that I make in this case.

If the ALJ read  In re O-D- to require a fact-finder automatically to discredit all of an applicant's testimony wherever a lie was told, this would be a blatant misreading of In re O-D- and an irrational rule to boot.  But quite apart from the ALJ's own reference to the possibility of "explanation or rebuttal," we think that in context the ALJ was merely describing the evaluation made in In re O-D- and that the ALJ then went on to make his own evaluation about the significance of the discrepancies in this case

-15-

for the rest of Yongo's story underpinning his claim of persecution.

Thus, in his written decision the ALJ--after saying that In re O-D- provided "some guidance"--continued by saying that, if accepted at face value, Yongo's testimony about his treatment in Zaire laid the basis for a good claim of asylum. The decision then continued (emphasis supplied):

> However, because of the fact that I do not believe the respondent was credible regarding the issue of when and how long he stayed in Germany, whether or not he filed for asylum in Germany, I do believe it discredits some of the other evidence, and therefore, I conclude as a matter of discretion that the respondent does not warrant a grant of asylum, and given the fact I don't believe he's entitled to asylum, I therefore conclude he's also not entitled to withholding.

In short, the ALJ made his own judgment, both about the extent of Yongo's deceptions and their significance. Having earlier put aside Yongo's use of a false passport as irrelevant, the ALJ concluded in the formal decision that the more serious deceptions about the stay in Germany and asylum application raised sufficient doubts about "some of the other evidence"--obviously a reference to the extent of persecution in Zaire--that the ALJ believed that Yongo had not established his claim.

In asylum proceedings the burden is upon the applicant to prove a legitimate fear of persecution. 8 C.F.R. § 208.13(a) (2003). In many cases, almost all of the pertinent information is

-16-

in the applicant's possession but this in turn makes the applicant's credibility a matter of extreme importance. Where that credibility has been seriously forfeit, the fact-finder may be left in enough doubt about the balance of the testimony to conclude that the applicant has not proved his case. We think that is what happened here, noting once more that the issue is not one raised by Yongo himself on this appeal.

Yongo's last independent claim, advanced by able amici, is that the BIA's streamlined affirmance without opinion procedure, 8 C.F.R. § 1003.1(e)(4)(2003)(formerly 8 C.F.R. § 3.1(e)(4)), violates tenets of administrative law. Although amici have attempted to recast their argument in light of new case law, the core of the argument was rejected by panels of this circuit in Albathani, 318 F.3d at 377-79, and El Moraghy, 331 F.3d 195, 205 (1st Cir. 2003), which are binding on this panel. We also reject amicis' argument that this case was not a proper candidate for affirmance without opinion under the criteria set out in 8 C.F.R. § 1003.1(e)(4)(i) (2003)(formerly 8 C.F.R. § 3.1(e)(4)).

The petition for review is denied.


Concurrence follows.

**OBERDORFER**, <u>**Senior District Judge**</u>, **concurring**.  I am concerned that the ALJ misconstrued <u>In re O-D-</u>, 21 I. & N. Dec. 1079(BIA 1998) to the extent that he suggested that any false testimony, here the false statement about Germany, "has the effect of discrediting the applicant's entire claim."  I am satisfied, however, that the ALJ on remand would again reach the same conclusion upon review of the <u>totality</u> of the facts and circumstances, including, but not limited to, the German matter, as detailed in the majority's recitation of the facts and analysis of the law and the facts.