NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0162n.06
Filed: March 2, 2005

## No. 03-4318

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| FATMIR KASA, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | On Petition for Review of an Order |
| | ) | from the Board of Immigration |
| ALBERTO GONZALES, | ) | Appeals |
| | ) | |
| *Respondent.* | ) | |

**Before:** **BOGGS, Chief Judge; and KENNEDY and MARTIN, Circuit Judges.**

**PER CURIAM.** Fatmir Kasa petitions this court to review the denial by the Board of Immigration Appeals of his application for asylum and associated relief. Because the Immigration Judge had substantial evidence to support his adverse credibility determination and did not violate Kasa's due process rights during the hearing, we deny the petition for review.

## I

Fatmir Kasa was born on November 18, 1958, and lived in Tirana, Albania prior to coming to this country. He entered the United States on December 16, 1999 with a visa authorizing him to remain in the country until March 15, 2000. He filed an asylum application on April 25, 2000, to which the INS responded with a Notice to Appear on May 23, 2000.

No. 03-4318
Kasa v. Ashcroft

Kasa requests asylum on account of political opinion. He claims to have been a bodyguard in the Guard of the Republic, the government organization that protects national leaders and visiting heads of state. Petitioner's account of persecution begins with his assignment to protect Fatos Nano, who had, at the time of Kasa's assignment, just become Prime Minister of the country. Following the assassination of a prominent Democratic party leader, Nano was forced to resign, at which point Kasa was reassigned to guarding foreign dignitaries. A power struggle ensued between Nano and his replacement as Prime Minister, culminating with both men competing in an election to become the head of the Socialist Party.

On the eve of that election, Kasa claims to have been asked by the owner of the Lady Diana restaurant in Tirana to visit the restaurant so that he could meet a mutual friend. According to petitioner, that friend turned out to be Nano, his former boss, who soon invited Kasa to join him in meeting some other acquaintances of his. After both men got into the former Prime Minister's car, petitioner testified, Nano asked Kasa to switch ballot boxes on the day of the election. Kasa testified that he refused because he believed Albania needed free elections. Kasa then claims that he was driven down an isolated street where he was subsequently abducted and driven to a police station in a different city. There, Kasa maintains, he was interrogated and beaten by four men who he thought were agents of the Albanian secret police. After the attack, Kasa stated, the men drove Kasa to his home where they told him not to leave the house. Kasa claims to have been attacked again when he left his house to see a doctor for help with his injuries.

Because of these incidents, Kasa testified, his family went into hiding and he was fired from his job. Though Kasa eventually received a visa from the American Embassy in Greece, he was

unable to get visas for the rest of his family. He then left for this country from Tirana's airport with help from a former co-worker who was now working there. Kasa claims that his family continues to be persecuted in Albania because of his refusal to fix the election. Since Kasa left Albania, his brother has apparently been interrogated and stabbed twice by the secret police. However, Kasa also claims that his brother was able to return Kasa's weapons to the proper authorities and provide Kasa with a receipt confirming that he had done so.

With the assistance of counsel and an interpreter, Kasa had a hearing before an Immigration Judge ("IJ"). As part of this hearing, Kasa submitted corroborating evidence in the form of his two asylum applications, several photographs of Kasa and various leaders, the receipt from the return of his weapons, and a newspaper article concerning his uncle's death, which Kasa believes was politically motivated. More important to this appeal, he also submitted his Guard of the Republic identification card, his passport, and a certificate, which probably concerns his termination from employment. The government responded by entering the Country Reports for Albania and a report from the American Embassy in Albania claiming that Kasa's identification card and certificate were fraudulent. Kasa also brought a witness, Afrim Lavanaku, to testify that he had worked in the same agency as Kasa and could recognize people in Kasa's pictures. The IJ denied Kasa all relief in an oral decision following the hearing. He concluded that Kasa was not credible because he concluded that several of Kasa's documents were fraudulent. Alternatively, he decided that Kasa had not met his burden of proof because he lacked corroboration. He further found that, even if Kasa was credible, he had not been persecuted for an enumerated ground. The Board of Immigration Appeals affirmed without issuing an opinion. Kasa timely appeals to this court.

**II**

The decision to grant asylum is a two-step inquiry. *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003). The first step is whether the applicant qualifies as a refugee. Only if the petitioner qualifies as a refugee may the Attorney General exercise his discretion and grant asylum. *Ibid.* In this case, the IJ and the BIA ended the inquiry at the first step by determining that Kasa did not qualify as a refugee. It is this determination that we now review on appeal.

A refugee is an alien who is "unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision directly. *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). We review that decision under the substantial evidence test. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). In the immigration context, that test has been construed to allow reversal only if "the evidence presented by [the petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). This standard has since been codified by stating that this court can reverse only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Yu,* 364 F.3d at 702-03 & n.2 (6th Cir. 2004) ("officially adopt[ing]" substantial evidence as articulated in § 1252(b)(4)(B)).[1]

---

[1]Though the IJ denied Kasa's request for protection under the Convention Against Torture, Kasa does not raise any argument about this ground in his brief. Relief on that ground is therefore waived. *United States v. Mick*, 263 F.3d 553, 567 (6th Cir. 2001); *see also Abati v. Ashcroft*, 101 Fed. Appx. 626, 627 (6th Cir. June 17, 2004) (unpublished opinion) (holding that Convention

Kasa also appeals the IJ's decision to deny his request for withholding of removal. The grounds for withholding of removal are the same as those used for asylum, except that instead of proving a "well-founded fear of persecution," 8 C.F.R. § 208.13(b), the applicant "must demonstrate a clear probability that he would be subject to persecution." *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). Therefore, Kasa faces the same question, just with "a more stringent showing of truth." *Ibid.* A determination that Kasa is ineligible for asylum forecloses discussion of withholding of removal. *Ibid.*

We review an adverse credibility determination for substantial evidence. *Yu*, 364 F.3d at 703. In this case, the IJ's adverse credibility determination rests largely on his conclusion that Kasa presented fraudulent documents to support his claim for asylum. Like our sister circuits, we have found the use of false documents sufficient to support an adverse credibility determination. *See Gueladio v. INS*, 102 Fed. Appx. 909, 911 (6th Cir. June 15, 2004) (unpublished order); *Yongo v. INS*, 355 F.3d 27, 33 (1st Cir. 2004); *Akinmade v. INS*, 196 F.3d 951, 955-56 (9th Cir. 1999). As the First Circuit has commented, the presentation of false documents "*submitted to prove a central element of the claim in an asylum adjudication* indicates [petitioner's] lack of credibility and in the absence of an explanation regarding such presentation, creates serious doubts regarding the respondent's overall credibility." *Yongo*, 355 F.3d at 33 (quoting *In re O-D-*, 21 I. & N. Dec. 1079, 1083 (BIA 1998)) (quotation marks omitted and emphasis added).

Against Torture claim is waived because it is absent from petitioner's brief).

The IJ found Kasa's identification card to be fraudulent. We must therefore decide whether the card was submitted to prove a central element of his asylum claim and, if so, whether the IJ had substantial evidence for his factual determination that the card was not genuine. *See* 8 C.F.R. § 1252(b)(4)(B) ("administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ."). Kasa presented the identification card to prove that he had indeed been a member of the Guard of the Republic. His employment by that branch of the Albanian government is essential to his claim for asylum, as it is the basis of his alleged relationship with Fatos Nano, from which his account of persecution stems. We therefore conclude that Kasa's identification card was submitted to prove a central element of his claim.[2] *See Yongo*, 355 F.3d at 33.

Thus, we must review, under the "substantial evidence" standard, the IJ's factual determination that the document was false. Because the IJ had more than enough evidence to reach his conclusion, we affirm his determination that the document was false, and therefore, also, his conclusion that Kasa lacked credibility. The IJ's conclusion was based on his own careful examination of the identification card as well as a report from the American Embassy in Albania.

---

[2]Our sister circuits have excused the presentation of a false document when either that document has been presented for reasons other than proof in a removal proceeding, *see Akinmade*, 196 F.3d at 955 (quoting *In re O-D-*, 21 I. & N. Dec. at 1081) (document submitted for purpose of gaining entry into the United States), or the petitioner offers an excuse for the presentation of the fraudulent document, such as that he received it from another person, *see Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 911-13 (9th Cir. 2004) (false medical certificate procured by petitioner's sister insufficient grounds for adverse credibility determination); *Kourski v. Ashcroft*, 355 F.3d 1038, 1039-40 (7th Cir. 2004) (same result when false document was given to petitioner by his mother). As Kasa submitted the identification card to prove a central element of his asylum claim and offers no excuse as to why the document is fraudulent, we do not consider these exceptions.

The IJ also closely examined the card and determined it was a forgery. The identification card appears to have been created in a way that suggests tampering. The IJ also noted two troubling similarities between Kasa's passport and the identification card. Kasa testified that his current passport was issued in 1999 and that it did not have the same number as his previous passport, which had been issued in 1994. He received his identification card, according to him, in 1996. Given the three-year span between the times he received the two documents, the photographs in the two should not be very similar. But they are nearly identical: Kasa wears the same jacket, suit, and tie in both photos; and his hair looks identical in the two pictures. This suggests, at the least, that the identification card is fraudulent. Even more damaging, Kasa's identification card, issued in 1996, has the same number on it as his 1999 passport. This would not be troubling except for Kasa's own testimony that his 1994 passport, the one he had when he allegedly received the identification card, had a different number. Kasa's corroborative witness confirmed that, in general, Albanian passport numbers change with each successively issued passport. Further supporting the IJ's conclusion, the witness testified that identification cards usually had issuance dates, which Kasa's did not have.

In addition, the Embassy report concluded the identification card was false based on an investigation that included a review of internal records of the Albanian government and conversations with supervisors in the branch where Kasa claims to have been employed. In addition, pursuant to the investigation, the people who supposedly signed his identification card denied having done so. That includes the former Commander of the Guard of the Republic.

Therefore, the IJ had more than substantial evidence that the document was false. Because the identification card was submitted to prove a central element of Kasa's claim, we are simply not

compelled to conclude that he presented a credible claim for asylum. Having found the IJ to be well-supported in one of his reasons for denying Kasa refugee status, we need not address his other two grounds.

## III

Fifth Amendment guarantees of due process require that aliens in deportation hearings receive a full and fair hearing. *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001). We review a due process challenge *de novo*. *Ivejaz v. INS*, 84 F.3d 215, 220 (6th Cir. 1996). However, the petitioner has the burden of showing that the alleged error prejudiced his case. *See Huicochea-Gomez*, 237 F.3d at 699 ("a defect in the removal proceedings must have been such as might have led to a denial of justice.") (quotation marks and citations removed).

Though the presence of a biased IJ may raise due process concerns, *see, e.g.*, *Iliev v. Ashcroft*, 127 F.3d 638, 643 (7th Cir. 2003), we do not believe the IJ in this case displayed any such bias. Petitioner only alleges that the IJ erred in analyzing the evidence. Such allegations cannot sustain a charge of bias against an IJ. *Cf. Ivejaz*, 84 F.3d at 220 ("due process requires that [petitioner] be given an opportunity to be heard . . . .") Were they to, every reversal of an IJ's decision would also result in a due process challenge. More to the point, such allegations cannot sustain a charge of bias in this case where the IJ's conclusions were warranted by the evidence presented. *See* part II, *supra*.

In addition, we hold that petitioner's due process rights were not violated by the admission of the report summarizing the American Embassy's investigation into Kasa's documents. The Federal Rules of Evidence do not apply to immigration proceedings. *Dallo v. INS*, 765 F.2d 581,

586 (6th Cir. 1985). However, because aliens have due process rights in removal proceedings, the Fifth Amendment provides some limits on what evidence can be admitted. We have recognized that "'the due process test for admissibility of evidence in a deportation hearing is whether the evidence is probative and whether its use is fundamentally fair.'" *Ayyoub v. INS*, No. 02-3679, 93 Fed. Appx. 828, 834 (6th Cir. Mar. 25, 2004) (unpublished opinion) (quoting *Felzcerek v. INS*, 75 F.3d 112, 115 (2d Cir. 1996) (quoting *Bustos-Torres v. INS*, 898 F.2d 1053, 1055 (5th Cir. 1990))). In determining whether the admission of evidence is fundamentally fair, two sets of considerations emerge. First, the petitioner must be given a meaningful ability to respond to the harmful evidence. *See Gailius v. INS*, 147 F.3d 34, 46 n.7 (1st Cir. 1998); *Sulo v. Ashcroft*, No. 03-1083, 114 Fed. Appx. 253, 256 (7th Cir. Nov. 8, 2004) (unpublished opinion) (applying *Gailius*'s reasoning)*.* Second, whether the evidence is trustworthy and reliable affects the fundamental fairness of its admission. *See Felzcerek*, 75 F.3d at 115. Given these broad standards, "the test of fundamental fairness turns on the facts." *Yongo*, 355 F.3d at 32.

In this case, the American Embassy in Tirana produced a report concluding that two of Kasa's proffered documents, including his identification card, were false. The report, which is a signed telegram from a Vice Consul at the Embassy, indicated the background and experience of the investigator. It also summarized the investigation that led to the conclusion that Kasa had submitted false documentation. Though the contents of the report were hearsay, neither the admission of this report nor the method in which it was used by the IJ affected the fundamental fairness of Kasa's removal proceeding. Though any hearsay document creates doubts as to its trustworthiness, the report confirms its reliability and trustworthiness by specifying the steps taken in the investigation

and clarifying that the purpose of the investigation was never made clear to members of the Albanian government. *See Ezeagwuna v. Ashcroft*, 325 F.3d 396, 408 (3d Cir. 2003) (concluding that a letter that stated only conclusions of a supposed investigation was inadmissible in a removal proceeding in part because "the complete dearth of information about the investigator or the investigation undermines the . . . letter as not only untrustworthy, but also unhelpful."); *see also Yongo*, 355 F.3d at 32 (emphasizing this factor in *Ezeagwuna* in reaching a different conclusion).

The report's detailed summary of the investigation that took place not only buttressed the report's reliability, it also allowed petitioner a meaningful opportunity to rebut the Embassy report. *See Gailius v. INS*, 147 F.3d at 46 n.7. Kasa, in fact, took this opportunity when he asked his witness questions about the quality of records kept by the Albanian government. This suggests that the use of this report as a means of proof was not fundamentally unfair. Further contributing to the fundamental fairness of this report's admission is the IJ's failure to rely on the report as the sole, or even primary, reason for concluding that the identification card was false. *See Ezeagwuna*, 325 F.3d at 406 (noting that while hearsay evidence can be admitted in asylum cases, reliance on such evidence may raise due process concerns). He closely examined the card and gave numerous reasons, based in part on Kasa and his corroborative witness's own testimony, for his conclusion that the card was not genuine. In such a case, where a hearsay document is admitted but not primarily relied upon and the petitioner receives the opportunity to rebut the document's conclusions through his witnesses, the fundamental fairness of the proceedings has not been impinged. Thus, Kasa suffered no violation of his due process rights during his removal hearing before the IJ.

In addition, Kasa cannot sustain a due process challenge because he cannot establish that he was prejudiced by the admission of the letter. *See Warner v. Ashcroft*, 381 F.3d 534, 539 (6th Cir. 2004) ("proof of prejudice is necessary to establish a due process violation in an immigration hearing."). The IJ had multiple reasons for believing the identification card was fabricated, of which the Embassy report was but one. Kasa therefore cannot show that he would have received refugee status were the IJ to have excluded the report. Thus, even were we convinced that the fundamental fairness of the proceeding had been compromised, which we are not, relief would still be inappropriate. For the reasons set forth above, we DENY the petition for review.