NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0079n.06
Filed: January 31, 2006

Nos. 04-3700

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

ARJAN REXHA,

     Petitioner,

v.

ALBERTO GONZALES, Attorney General of the
United States,

     Respondent.

ON PETITION FOR REVIEW FROM
A FINAL ORDER OF THE BOARD
OF IMMIGRATION APPEALS

_____/

Before:     MARTIN, COLE and GILMAN, Circuit Judges.

     BOYCE F. MARTIN, JR., Circuit Judge. Arjan Rexha, a citizen of Albania, entered the United States in 1998 by using a visa that was fraudulently issued. When the government initiated removal proceedings, Rexha requested asylum on the basis of past persecution due to his membership in the Democratic Party of Albania and the "Cham" ethnic minority. The immigration court denied his application, relying essentially on a Department of State report that concluded that three of Rexha's supporting documents were forgeries. The immigration court then made an adverse credibility finding and, on that basis, determined that Rexha did not establish past persecution and that he did not qualify for withholding of removal or relief under the Convention Against Torture. Rexha appealed to the Board of Immigration Appeals, which affirmed the immigration court's decision. He then sought timely review by this Court. This case is not about the substantive decisions an immigration court may make. It is about the proper procedures that it must employ

before denying a petitioner asylum. Because proper administrative procedure requires that an immigration court provide a fair hearing giving due consideration to an alien's arguments, and because the immigration court in this case prematurely ended that process by failing to consider a substantial amount of supporting documentation, we GRANT the petition for review and REMAND for further consideration.

I.

Rexha attempted to enter the United States through Chicago's O'Hare International Airport in 1998. He was then 23 years old. Rexha arrived with several documents, including a writing that identified him and his father as members of a group known as the Persecuted Political People, a copy of his membership card in the Democratic Party of Albania, and another paper concerning his father's political affiliation. Although the record is not entirely clear, Rexha may also have brought a document issued in 1991 describing the medical treatment that he had received for wounds allegedly sustained as a result of police beatings. The government declined to grant Rexha asylum, in part due to his use of a visa that the government believed, and Rexha later admitted, was not legally issued.

Rexha requested asylum during the removal proceeding that was initiated against him in April of 1998. His claim of past persecution rests primarily on his membership in the Democratic Party of Albania and in the "Cham" minority, a group whose ancestors moved to Albania after being expelled from Greece in the late 1940s.

In March of 2003, Rexha was the sole witness at the merits hearing on his asylum claim before an immigration court. Rexha described how his father and grandfather had been viewed as

enemies of the state due to their anticommunist ideals and their Greek ancestry. He also testified about several incidents of violence allegedly perpetrated against him by the Albanian government. In 1990, he was allegedly jailed for two weeks and beaten by the communist police for tearing down a portrait of Enver Hoxha, the former leader of Albania, that hung in Rexha's classroom at school. His involvement in anticommunist demonstrations and his induction as an official member of the Democratic Party of Albania in 1996 also placed him at risk, according to his testimony.

In addition, Rexha recounted the treatment of his family in 1996 and 1997, a period of great unrest in Albania. He alleged that he was beaten by the secret police for reading a democratic newspaper; that a bomb was thrown into his family home, which resulted in injury to his mother's leg; and that his sister was raped five days later, when five armed men forced their way into his home and assaulted several of his family members. Finally, Rexha testified to the incident that allegedly precipitated his departure from Albania, in which he was kidnapped and held hostage by the secret police at an undisclosed location. Rexha claims to have heard agents in another room telephone his father and threaten to kill Rexha if his father refused to carry out their instructions. He testified that he was able to escape through a bathroom window.

Approximately 37 documents were submitted by Rexha and admitted into evidence in support of his claims, including an eyewitness account and a medical certificate detailing his mother's treatment after the bomb-throwing incident, reports from a medical facility describing police beatings inflicted upon Rexha, membership cards in various persecuted minority groups, and a Certificate from the Ministry of Public Order showing that he was sentenced to eight months in prison for agitation and propaganda in February of 1990. These exhibits were discredited by the

immigration court, however, in part because of Rexha's failure to promptly concede that he had used a fraudulent visa in attempting to enter the United States. The immigration court relied to an even greater extent upon the government's Exhibit A, a report of a Department of State investigation into three of the documents that Rexha submitted in support of his claim.

According to Exhibit A, which was completed with the assistance of a consular investigator working for the Department of State in Albania, three of the documents submitted by Rexha—two medical certificates from 1991 and 1996 and a 1997 police report— were forgeries. The report states that the consular investigator met with Sherbet Saraci, the head nurse of the Tirana Medical Emergency Facility. Mr. Saraci told the investigator that the medical certificate from 1991 was invalid because the stamp placed on the certificate was not in use until 1993. In addition, Mr. Saraci declared the 1996 medical certificate a fabrication because the signature was forged and the form was filled out inaccurately. Finally, Exhibit A states that a consular officer requested verification that the police report regarding the bombing of Rexha's home, allegedly issued on April 14, 1997, was valid. The Tirana police replied that the police report submitted by Rexha is a forgery because the actual report was never given to Rexha and the stamp on the certificate was forged.

After Exhibit A was submitted, Rexha claimed that the primary consular investigator, a man named Artan Ceci, was a former communist party member who was not impartial. Rexha was then given two years to rebut the questioning of his documents. As rebuttal evidence, he submitted letters that purport to be from "Doctor Saraci," which assert that Rexha was treated for wounds in 1991. But Saraci is actually the head *nurse* of the medical facility, not a physician, causing the immigration court to find that Rexha's rebuttal evidence "only raised other issues about the truthfulness of his

whole claim." Rexha also attempted to corroborate the 1997 police report by submitting an affidavit from his neighbor in Tirana, who verified that Rexha's home was bombed in 1997, and an affidavit from members of the staff of the hospital where Rexha's mother was treated for wounds from the bombing.

Ultimately, the immigration court did not discuss the numerous documents that Rexha submitted to support his claim. The immigration court stated that "[w]hen this Court takes into account the fact that [Rexha] came to the United States with a fraudulent visa which he denied until his merits hearing, it is clear that the documents submitted Rexha are not to be credited on his behalf." Nor is there any evidence in the record that the immigration court even considered these documents. The immigration court also found that Rexha's characterization of himself as a hemophiliac was inconsistent with the lack of serious medical repercussions following the vicious beatings he allegedly incurred in 1991 and 1996. Rexha's lack of follow-up visits is "not realistic, given [Rexha's] stated medical condition," according to the immigration court.

The immigration court therefore discredited Rexha's testimony and denied his applications for asylum, withholding of removal, and relief under the CAT. Rexha appealed the denial of his petition to the BIA, which affirmed the immigration court's decision in a per curiam order. This timely petition for review followed.

II.

Because the Board of Immigration Appeals adopted the immigration court's decision without issuing its own opinion, we review the immigration court's ruling as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005). Questions of law involving immigration

proceedings are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). In the ordinary case, we affirm an immigration court's decision that a petitioner has failed to establish his eligibility for asylum if it is "supported by reasonable, substantial, and probative evidence on the record *considered as a whole*." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (emphasis added).

Pursuant to the Immigration and Nationality Act, an asylum application must show that he is a "refugee." 8 U.S.C. § 1158(b). A refugee is an individual who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant bears the burden of showing that he has suffered past persecution or has a reasonable fear of future persecution. 8 C.F.R. § 1208.13(a). Asylum applicants who can prove that they were persecuted in their country in the past are presumed to have a well-founded fear of future persecution, but the government can rebut that presumption with evidence that the country conditions have fundamentally changed. *See* 8 C.F.R. §§ 1208.13(b)(1), 1208.13(b)(1)(i)(A).

Rexha claims that he suffered past persecution on account of his political beliefs and that he has a reasonable fear of future persecution because the Socialist Party currently ruling Albania is allegedly just an extension of the former communist regime. The immigration court concluded that Rexha was not credible, but Rexha argues that this adverse-credibility determination is contrary to substantial evidence in the record. Specifically, Rexha notes that he submitted thirty-seven documents in support of his claim and he faults the immigration court for failing to consider thirty-four of the documents he submitted without sufficient explanation. Credibility findings "must be supported by specific reasons," *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004), and adverse

credibility findings must "go to the heart of an applicant's claim . . . [and] 'cannot be based on an irrelevant inconsistency.'" *Id.* (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). Finally, the immigration court's decision must be based "on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481.

The immigration court's adverse credibility determination was based on several factors. Most notably, the immigration court relied on Exhibit A, which reported that an investigation conducted in Tirani, Albania, revealed that three of the documents Rexha submitted were forgeries. Rexha responds by arguing that because there were numerous documents that bolstered his testimony and only three were discredited, the adverse credibility determination was not made on the record considered as a whole. The government responds by citing our decision in *Selami v. Gonzales*, where we held that "submission of a fraudulent document in support of a key element of an asylum claim is sufficient to support an adverse credibility determination." 423 F.3d 621, 625 (6th Cir. 2005).

Our decision in *Selami* does stand for the proposition that one forgery *can* support an adverse credibility finding. But, *Selami* does not do as much as the government hopes. There is no indication from *Selami* that the immigration court failed to consider any other evidence upon discovering the forged newspaper article. In fact, the immigration court determined that the fraudulent newspaper article "cast[ ] [Selami's] entire testimony and evidence in this case in doubt." *Id.* at 624 (quoting Removal Hr'g Tr. at 175). Likewise, in *Selami*, this Court cited the BIA's opinion that "[s]uch fraud tarnishes [the applicant's] veracity and diminishes the reliability of his *other* evidence." *Id.* at 625 (quoting *In re O-D-*, 21 I. & N. Dec. 1079, 1083 (BIA 1998) (emphasis

added)).  Our decision in *Selami* and the Board of Immigration Appeals's decision in *In re O-D-*, however, do not stand for the proposition that an immigration court need not even look at the *other* evidence.  We certainly cannot decide cases after reading only the first ten pages of the parties's briefs and record — even if they contain, as they sometimes do, gross distortions of the facts.  The same holds true for the courts we review.  In this case, not only did the immigration court fail in its decision to discuss the substantial number of documents Rexha submitted, but there is no evidence in the record to indicate that he even looked at or considered the documents.  Fraudulent documents certainly cast doubt on the remainder of a petitioner's evidence, but an immigration court must actually consider the other evidence before so concluding.  We have never held, and reject so holding, that an immigration court need not *consider* all of the evidence brought before it, regardless of the strength of the petitioner's claims.[1]

The underlying purpose of these proceedings is, of course, determining whether the petitioner was in fact persecuted or has a well-founded fear of persecution.  It is more important to determine whether the events alleged actually happened, rather than whether the petitioner made inconsistent statements or produced false documents.  *See Pergega v. Gonzales*, 417 F.3d 623, 628 (6th Cir. 2005) ("Whether Pergega *reported* the kidnapping and beating to the police is less relevant than the fact that he was *actually* kidnapped and beaten.").  That is to say, although inconsistencies can undermine a petitioner's claim, an immigration court must consider the evidence before making

---

[1]Although immigration courts need not engage in a ritualistic incantation of each piece of evidence brought before it, there must be evidence in the record that the immigration court gave reasoned consideration to all of the evidence, such that we can be convinced that the court's determination is based on the record *as a whole*.  *See Martinez v. INS*, 970 F.2d 973, 976 (1st Cir. 1992).

the ultimate determination that the petitioner is so lacking in credibility that we cannot believe his version of events. On remand, the fraudulent documents *may* be sufficient to support an adverse credibility finding once again, but we cannot conduct a proper review, nor can the immigration court properly evaluate a petitioner's claim, without doing so "on the record considered a whole."[2] When the immigration court fails to give due consideration to the petitioner's claims, the proper course is for this Court to grant the petition and remand for further consideration in a full and fair hearing. *See e.g.*, *Sosnovskaia v. Gonzales*, 421 F.3d 589, 594 (7th Cir. 2005). Anything less requires us to "conclu[de] that the IJ did not thoroughly consider all of the issues raised." *Id.* at 593. This procedure does not intrude upon the authority of immigration courts to make substantive decisions based on a full consideration of the evidence; it merely reinforces the procedural requirements necessary to accord petitioners their fair day in court.

---

[2]We also have concerns about the immigration court's other reasons for not considering Rexha's documents. Essentially, the fact that most of the documents were sent to Rexha after he arrived here caused the immigration court to question whether they were fraudulently procured by his family to support his claim. There is, of course, the possibility that some of the documents were fraudulently procured, but this is not reasoning — it is speculation. We would find it odd to hold against Rexha the fact that upon arriving in the United States he was not entirely prepared for full-scale litigation. Rexha did arrive in the United States with "several documents, including a writing that identified him and his father as members of a group known as the Persecuted Political People, a copy of his membership card in the Democratic Party of Albania, and another paper concerning his father's political affiliation. It is certainly possible that Rexha believed these documents were sufficient for asylum in the United States. When the government sought to remove him, it is certainly possible that Rexha realized he had not come with sufficient evidence, and therefore asked his family members who still remained in Albania, to assist him with his claim. The point is that any speculation on this point is simply that. We cannot know the truth unless the immigration court actually looks at the evidence. *Sosnovskaia*, 421 F.3d at 594 ("Regardless of the strength of her case on the merits, fundamental tenets of proper administrative procedure demand that before [an alien] be deported, she should be granted a fair hearing in which the judge gives due consideration to her arguments.").

We believe this is the proper course of action for this case, especially in light of the fact that, in our opinion, without consideration of Rexha's supporting documentation, this is a close case. It is especially close because of the immigration court's primary reliance on the hearsay report from the Department of State. Although, as we discuss *infra*, we believe that the report in question here passes muster, we reiterate emphatically that immigration courts and the Board should exercise extreme caution in relying on such reports to deny asylum claims. Asylum applicants are entitled to the due process of law and excessive deference to the government or a shallow evaluation of the evidence by the immigration court would be unwarranted. *See Benslimane v. Gonzales*, 430 F.3d 828 (7th Cir. 2005) (Posner, J.).[3]

---

[3]Excessive reliance on these reports is particularly dangerous in cases such as these where the petitioner alleges that the report was prepared with the assistance of someone from the government from which he is fleeing. In this case, although Rexha never produced any compelling evidence that the investigator who prepared the report formerly worked for the communist regime's secret police, the allegation, and the evidence Rexha did present on this point, should have at the very least led the immigration court to substantiate its reliance on this report by considering the remainder of the evidence. Additionally, other courts have written about why forged entry documents should not completely undermine a petitioner's credibility. *See e.g.*, *Nreka v. United States Attorney Gen.*, 408 F.3d 1361, 1368 (11th Cir. 2005) (discussing the motivations that individuals may have to use forged entry documents). Likewise, although forged documents definitely undermine a petitioner's credibility, we feel that the same principle with regard to entry documents is the same throughout the proceedings. It is common knowledge, both as a result of various court decisions and newspaper articles, that asylum grants are few, actual proceedings are short due to an immigration court's time constraints, and the actual time an immigration court has to devote to each claim is minimal. As a result, petitioners likely feel like they have to hit the immigration court over the head with the weight and persuasiveness of their evidence (regardless of the true merit of their claims). Moreover, horror stories persist of nasty, arrogant, and condescending immigration courts. *See e.g., Sukwanputra v. Gonzales*, No. 04-3336, – F.3d – (3d Cir. 2006). (We note here that we disagree with this immigration court's legal decisions, but have no qualms with its handling of the proceedings). Petitioners must stop using fraudulent documents. Immigration courts must review all of the evidence and make decisions based on consideration of the record as a whole, and with a basic understanding of the motivations and fears of those appearing before them. These proceedings are not about speed and docket clearing. Asylum cases, as with

III.

Rexha also challenges the immigration court's reliance on the government's Exhibit A, the report provided to the parties by the Office of Country Reports and Asylum Affairs of the Department of State. Exhibit A was completed with the assistance of Artan Ceci, who conducted the investigation into whether three of the documents Rexha submitted were forgeries. Rexha argues that undue weight was given to Exhibit A because (1) it was never authenticated under the procedure set forth in 8 C.F.R. § 287.6, (2) Ceci was employed by the Albanian police during the communist regime, and (3) the admission of the report constitutes double hearsay, which raises questions about fundamental fairness and due process. According to Rexha, Exhibit A does not support the immigration court's adverse credibility determination. We address Rexha's arguments in part to provide the immigration court with guidance. We do not reach the ultimate question about whether the immigration court's primary reliance on the report is supported by substantial evidence because of our holding above.

Rexha's first argument, that Exhibit A was not properly authenticated, fails because 8 C.F.R. § 287.6 "offers one, but not the exclusive, method for authenticating a document in an INS proceeding." *Yongo v. INS*, 355 F.3d 27, 31 (1st Cir. 2004) (citation and quotation marks omitted). Authentication, a "practical and flexible . . . doctrine []," *id.* at 30, is a process designed to ensure that the document is what it purports to be, not that the contents of the document are "necessarily

---

all proceedings, ought to be about doing justice. And, immigration courts should take some extra time to consider all of the evidence before rejecting petitioners whose bad judgment does not necessarily overshadow a genuine fear and possibility/likelihood of harm to them upon their deportation. Forgeries no doubt entitle an immigration court to proceed with a skeptical eye. With such skepticism, however, there must be evidence in the record that all the evidence was considered.

true." *Id.* at 31 (quotation omitted). Rexha provides no evidence that Exhibit A, which came through the Embassy in Tirana and was provided by the Department of State, is a forgery.

As in *Yongo*, however, a separate objection based on hearsay concerns remains because the relevance of Exhibit A "depended on the truth of the statements made in the documents." *Id.* In this case, the investigation described in Exhibit A was undertaken by someone other than the preparer of the report. This constitutes double hearsay, and Rexha argues that his right to due process was compromised because he could not cross-examine the main investigator, Ceci, whom Rexha believes to be biased.

But the immigration court is not bound by formal hearsay rules, even though "[h]ighly unreliable hearsay might raise due process problems." *Id.*; *see also Ileana v. INS*, 106 F. Appx. 349, 353-54 (6th Cir. 2004) (unpublished) (holding that the rules of evidence do not apply in immigration hearings, but that administrative agencies are bound "only by the looser standard of due process of law") (citation and quotation marks omitted). The government can establish a report's "reliability and trustworthiness by specifying the steps taken in the investigation." *Kasa v. Gonzales*, 128 F. App'x. 435, 440 (6th Cir. 2005) (unpublished) (citing *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 408 (3d Cir. 2003)).

In the present case, Exhibit A recounts the ways in which Ceci determined that the three documents in question were forgeries. For the medical documents from 1991 and 1996, Ceci spoke with the head nurse of the facility where Rexha claimed that he was treated. Head nurse Saraci told Ceci that the medical certificate from 1991 had a stamp that was not used until 1993, and that the 1996 certificate contained a forged signature. Exhibit A also describes how Ceci contacted the

Tirana police, who confirmed that Rexha's police certificate was not authentic. The detail included in Exhibit A distinguishes this case from *Ezeagwuna*, where the Third Circuit found that it was unfair to rely upon a letter that contained "absolutely no information about what the 'investigation' consisted of, or how the investigation was conducted." 325 F.3d at 408.

Rexha argues that he was denied due process, however, because the report failed to verify Ceci's determinations. For example, there was no expert testimony to support the report's conclusion that the signature in the 1996 medical certificate was forged, and no attempt was made by the investigator to procure an actual signature and compare it to the allegedly forged one. Rexha asserts that Ceci's investigation should have been conducted in a more complete manner, especially since it contains hearsay by declarants whom Rexha cannot personally confront.

But because Rexha questioned Ceci's impartiality, he was given approximately two years to rebut Exhibit A. Rexha was unable to do so. Although the employment of former communist party members to investigate asylum claims would raise serious concerns, Rexha never produced any compelling evidence that Ceci had in fact formerly worked for the secret police. Rexha instead testified that his cousin had informed him of this over the telephone. This rebuttal testimony is itself hearsay, and does not substantially undermine Exhibit A's credibility. In addition, although Rexha contends that his rebuttal letter describing Saraci as a doctor instead of head nurse was the result of translation errors, this unsupported explanation does not compel us to accept his rebuttal testimony. *See Marku*, 380 F.3d at 986 (6th Cir. 2004) (holding that factual findings will be reversed only if the evidence compels a contrary conclusion). In light of the report's level of specificity as to how it reached its conclusions, and given the fact that Rexha was afforded ample opportunity to discredit

the report, the immigration court's consideration of Exhibit A was not so fundamentally unfair that it violates Rexha's due process rights. *See Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir. 2004) (holding that evidence is admissible so long as its use is not fundamentally unfair). On remand, therefore, it would not be inappropriate for the immigration court to rely on this report. We reiterate our warning, however, that *undue* reliance on this type of report is not warranted and immigration court's should consider these reports along with a petitioner's other evidence.

IV.

We cannot conclude that the immigration court's decision denying asylum was based upon a consideration of the record as a whole. Fundamental fairness and proper administrative procedure require that an immigration court conduct a fair hearing and give due consideration to the petitioner's evidence before denying asylum and any decision must be supported by substantial evidence. By failing to indicate that it had adequately considered thirty-four of the thirty-seven documents Rexha submitted, the immigration court prematurely cut short that process. We therefore GRANT Rexha's petition for review and REMAND for further consideration and a decision based on consideration of the record as a whole.